724 F.Supp. 1282 (1989)
Jerry W. VOLKMAN, et al., Plaintiffs,
v.
UNITED TRANSPORTATION UNION, et al., Defendants.
Civ. A. No. 83-6025.
United States District Court, D. Kansas.
September 14, 1989.
*1283 *1284 Lee H. Woodard, David H. M. Gray and Ron D. Beal, Klenda, Mitchell, Austerman & Zuercher, Wichita, Kan., and Bruce H. Stoltze, Brick, Seckingtong, Bowers, Swartz & Gentry, P.C., Des Moines, Iowa, for plaintiffs.
Bennett, Dillon & Callahan, Mark L. Bennett, Jr., Topeka, Kan., and Robert S. Bogason, Co-Counsel, San Francisco, Cal., for St. Louis Southwestern Ry. Co., et al.
E.L. Lee Kinch, Ratner, Mattox, Ratner, Barnes & Kinch, Wichita, Kan., and Pamela D. Walker, Little Rock, Ark., for United Transp. Union, et al.

OPINION AND ORDER
THEIS, District Judge.

INTRODUCTION
This matter comes before the court after trial for entry of findings of fact and conclusions of law. The dispute arises out of the purchase and subsequent operation of a section of the Rock Island railroad by the defendant Saint Louis Southwestern Railway Company. Plaintiffs are a class of former Rock Island trainmen and all are members of the defendant Union. Plaintiffs contend they did not receive the jobs or benefits they were entitled to under a 1980 labor protective agreement. The 1980 agreement was a generic labor agreement applicable to all sales of portions of the bankrupt Rock Island. Plaintiffs assert that a 1982 agreement between the Saint Louis Southwest and the defendant Union abrogated the earlier agreement. Under the 1982 agreement, defendants allegedly reduced the number of plaintiffs the railroad had to employ, decreasing its operating costs, and switched the jobs from the plaintiffs, a minority faction of the Union, to the majority faction who already worked for the Saint Louis Southwest.
Plaintiffs have statutory and common law causes of action. The latter and primary cause of action is a hybrid action: a breach of contract claim against the employer defendant and a breach of the duty of fair representation claim against the union defendant. The statutory claim is based on 49 U.S.C. ง 11347 and is largely duplicative of the contract claim against the employer defendant.
The trial lasted from October 27 to December 29, 1989. The court received testimony from nearly 40 witnesses; the exhibits admitted into evidence fill numerous notebooks and boxes. The parties submitted nearly 1,000 pages of post-trial briefs. After a thorough review of this voluminous record, the court is prepared to rule pursuant to Federal Rule of Civil Procedure 52.

FINDINGS OF FACT

A. THE PARTIES
The court certified this action as a Fed.R. Civ.P. 23(b)(2) class action. The class includes:
All persons who worked for the Chicago, Rock Island and Pacific Railroad Company as brakemen or switchmen, who were eligible for employment with the St. Louis Southwestern Railway Company ("SSW") on the Tucumcari line within the meaning of the Labor Protective Agreement of March 4, 1980, including those who were employed by the SSW.
Class Certification Order, Dkt. no. 75 at 2. The court will refer to the class as "plaintiffs" or "Rock Island employees." The class representatives are two switchmen and eight brakemen.
*1285 Defendant Southern Pacific Company ("SPC") is a holding company which wholly owns defendant Southern Pacific Transportation Company ("SPT"). SPT owns approximately 99% of defendant St. Louis Southwestern Railroad Company ("SSW"). SSW Findings of Fact ("FF") at ถ 1.
SPT, also known generally as "Southern Pacific," operates railroad lines from Utah westward through Nevada and Oregon, southward through California and eastward into Arizona, New Mexico, Texas and Louisiana. Id. at 8. SSW, also known as the "Cotton Belt," has operated and continues to operate a line from St. Louis through Pine Bluff, Arkansas to Corsicana, Texas and then to El Paso where it intersects with an SPT line. The Texas to St. Louis route is known as the "Corsicana Line." Id. As described in section C, SSW began to operate over and eventually purchased the Rock Island's Tucumcari line in 1980.
The Tucumcari line begins at an SPT line in Santa Rosa, New Mexico and runs northeast through New Mexico to Dalhart, Texas, Pratt, Kansas, Herington, Kansas to Kansas City and then east to St. Louis. The Tucumcari Line and the Corsicana Line start in roughly the same place in the southwest and end in St. Louis but the Tucumcari is 400 miles shorter than the Corsicana. A map of the two routes and other relevant rail lines is attached as Appendix A, SSW Ex. 193. At sometime after the purchase of the Tucumcari Line, SSW renamed the two lines. The Corsicana Line became the Pine Bluff Division and the Tucumcari Line became the Kansas City Division.
SPT controls SSW. The court reaches this conclusion after examining the common officers and operations of the two companies. The chairman of the Board of Directors and chief executive officer for both defendants was Denman K. McNear. SPT and SSW had a common president, R.D. Kerbs. Pls. Ex. 8B at 23, 24. SPT and SSW had a common labor relations department. K.R. Peifer, an SSW-SPT officer for labor relations, wrote important memos about Tucumcari Line operations. Pls. Exs. 6C, 6D, 11D and 73; 9 Huntington at 14 [The citation to trial testimony will follow the above format: volume number, witness, page number.]. William Denton, an SPT-SSW vice president, signed the March 4 agreement for SSW and SPT. Pls. Ex. 5 at 15. Shortly after signing the March 4 agreement, Denton informed UTU president Fred Hardin who would represent SSW in labor matters on the Tucumcari Line. Pls. Ex. 7.
The common SPT-SSW operational relationship continues today. SPT employees, using SPT records, performed SSW's car count study and then testified for SSW. 23 Lee at 147-50; 24 Lee all; 25 Lee all; 26 Bosanko all; 27 Bosanko all; SSW Exs. 112, 113.
SPT and SSW were an integral part of SPC's railroad division. All three railroad defendants filed a joint brief in support of the SPT-SSW application to purchase the Tucumcari Line. They argued that if the ICC granted the application SPC would have a single carrier route to St. Louis: SPT from California to New Mexico and SSW from New Mexico to St. Louis. Pls. Ex. 8C at III-16. In a statement supporting the application, B.F. Biaggini, chief executive officer of SPC, stated he was "Chief Executive Officer of both applicants. ..." Pls. Ex. 122 at 1, 6. The headquarters for all three defendants is the Southern Pacific Building, One Market Plaza in San Francisco. 9 Huntington at 14, 36; 20 Koenig at 10-11; 23 Koenig at 63-64; Pls. Exs. 8B at 23 & 122 at 6. The San Francisco headquarters furnished various services for SSW-SPT: accounting services, 23 Koenig at 64, a common monthly employee publication, the Southern Pacific Bulletin, Pls. Exs. 8, 8A, 8D, 21A, 60, and labor relations advise and direction.
Defendant United Transportation Union ("UTU" or "Union") is an unincorporated labor organization, created pursuant to the Railway Labor Act. The UTU consists of an international union with headquarters in Cleveland, Ohio, and local chapters ("locals") at various points throughout the country. Pretrial Order Stipulations, Dkt. no. 86 at 7.
*1286 The UTU locals along the Corsicana Line included employees from two crafts: brakemen, switchmen and employees who held seniority in both crafts. In 1971, SSW brakemen and switchmen combined crafts. See infra, section B. 2. Brakemen and switchmen had separate locals on the Rock Island because the two crafts did not combine in 1971. 6 Swonger 25-27 (Pratt brakemen local chairman); 13 Will 140 (Herington switchman); 18 Schneider 24 (Herington switchman). Each UTU local elects officers and a Local Committee of Adjustment for the particular railroad on which the members of the local work. The chairman of the Local Committee also serves on the General Committee of Adjustment. Pls. Ex. 41 ("UTU constitution"), Arts. 56, 57, 81 & 82.
The UTU constitution sets out the normal role for the General Committee in labor negotiations. The General Committee negotiates and adopts collective bargaining agreements with a railroad. 5 Swonger at 53; 28 Hardin 96; UTU constitution, Art. 85. The chairman of the General Committee ("General Chairman") exercises the Committee's powers and duties. He is the executive officer for the General Committee and is the UTU's primary representative for all dealings with a railroad. 30 Arnett at 6; UTU constitution at Art. 87. The General Chairman ordinarily negotiates all collective bargaining agreements; he must then obtain the General Committee's approval of the general agreement. UTU constitution at Art. 85.

B. RAILROAD TERMINOLOGY AND SENIORITY SYSTEMS
Before the court delves into the heart of the law suit, the terms of the March 4 agreement and the subsequent abrogation of that agreement in a later implementing agreement, the court must explain some basic terminology which permeated the testimony and documents in this action.

1. Railroad Terminology
The plaintiff class includes brakemen and switchmen, also known as yardmen. The later two terms refer to the employees who "switch" cars or move them from one train to another in a railroad's "yard" โ a central location on a rail line where trains are broken up and put together for routing. Yardmen hold jobs by seniority and use the extra board procedure described below. 13 Will at 105-06. The court will use the term "yardmen" to describe this group.
An average train crew consists of an engineer, two brakemen and a conductor. Brakemen and conductors are known generally as roadmen or trainmen. 20 Koenig at 48. Brakemen operate "through" trains, which run from one end of the line to the other, and "local" trains, which run from one place on the line to another place on the line. Brakemen hold permanent or regular jobs on both types of trains and can work either type of train from the "extra board." 15 Donahue at 8-9; 15 Spaulding at 67; 15 Volkman at 125. Employees on the extra board are substitutes for the regular employees; they fill in whenever a regular brakeman is ill, on vacation or on personal leave. 5 Swonger at 44; 6 Swonger at 48; 13 Jones at 33-34; 15 Spaulding at 67; 15 Volkman at 125.
A brakeman is the entry level position for a conductor. A brakeman promoted to conductor starts accumulating conductor's seniority when promoted and also continues to accumulate brakeman's seniority. A conductor is eligible to obtain either a conductor's job or a brakeman's job. 5 Swonger at 40; 8 Blackburn at 99; 20 Koenig at 48. An extra board is also maintained for conductors. 15 Donahue at 9; 16 Volkman at 124.
A railroad would not assign brakemen or conductors working on through trains to a particular train; instead, they were assigned to a "pool" or a "turn." A pool on the Tucumcari Line consisted of an engineer, two brakemen and a conductor. The pools would work trains as they came through a terminal. 5 Swonger at 40; 10 Huntington at 114-15; 8 Jones at 33. The number of pools equaled the anticipated number of through freight trains which passed a terminal. 15 Donahue at 7-8; 15 Spaulding at 67; 15 Volkman at 125. The number of men on the brakemen's or conductors' *1287 extra board increased or decreased with the number of pools. 6 Swonger at 48-49; 15 Donahue at 8, 11; 15 Volkman at 125.
When business increased on a railroad sufficient to add another train, the railroad would establish additional pools at the terminals the trains traveled through. 6 Swonger at 49; 22 Koenig at 44-45. SSW, for example, would then advertise the new pool jobs and allow employees a set amount of time to bid on the jobs. 22 Koenig at 20-22; Pls. Exs. 23A, 23B & 23C. The advertisement would generally draw employees off the extra board and the railroad would bring its own employees off furlough or hire new employees to fill the extra board.
If a railroad lost business, it would reverse the process. The carrier would eliminate one or more pools along the line. Employees holding jobs in the eliminated pools could displace or "bump" those employees with less seniority holding jobs in other pools or on the extra board. The first bump would start a chain reaction of bumping in seniority order with men from pools going to the extra board and men on the extra board going on furlough. 8 Blackburn at 112-14; 15 Donahue at 11; 15 Spaulding at 67, 80; 22 Koenig at 45-46, 52. The seniority systems that governed bidding and bumping on the Rock Island and SSW are described below.
Based on rates of pay and working conditions, the brakemen's jobs described above had a generally recognized order of preference among the class: 1) conductor, 2) through trains, 3) local trains or yard jobs and 4) the extra board. 6 Swonger at 50; 13 Jones at 33; 13 Will at 110; 15 Donahue at 7-8, 11-12; 15 Spaulding at 67, 98-99; 16 Volkman at 9-10.

2. Seniority Systems
First, the Rock Island seniority system. A brakeman first gained seniority on the date he took his first compensated trip for the Rock Island. This date became his seniority day and was a valuable right in the seniority district where he took the first trip. 33 Donahue at 12. The Rock Island had four seniority districts for brakeman on the Tucumcari Line. The home terminals for these seniority districts were located at Eldon, Missouri; Herington, Kansas; Pratt, Kansas; and Dalhart, Texas. The brakemen from Eldon worked the traffic between Eldon and St. Louis and Eldon and Kansas City; the brakemen at Herington worked the traffic from Herington to Kansas City and Herington to Pratt; the brakemen at Pratt worked the traffic between Pratt and Herington to the east, and from Pratt to Liberal to the west; and the brakemen from Dalhart worked the traffic from Dalhart to Liberal to the east, and Dalhart to Tucumcari, New Mexico to the west. 5 Swonger at 47-48; 6 Swonger at 39-43; SSW Ex. 193 reproduced at App. A.
Seniority was not transferable from one district to another district. When a brakeman left one district to go to another, he received the same treatment as a person walking in off the street: he had no seniority in the new district. The "separate seniority districts" protected an employee with the least seniority `on' the district from an employee with the most seniority in an adjacent, `off' district. 5 Swonger at 74; 6 Swonger at 45-48, 67-68; 15 Donahue at 35-36, 56-57; 20 Koenig at 77-78; 23 Koenig at 67. If the Rock Island recalled a furloughed brakeman, the employee had a fixed number of days to respond or the railroad could terminate him. 15 Donahue at 13; 10 Huntington at 129.
Rock Island yardmen had two seniority districts for the entire Rock Island system โ divided roughly by the Missouri River. District 2 included the Tucumcari Line yards and many others to the south. 6 Swonger at 44-45; 7 Swonger at 99; 13 Will at 92-93; 30 Arnett at 15-16. Yardmen had district wide seniority and could obtain jobs throughout the district using their seniority date. An exception existed, however, for yardmen with a seniority date earlier than June 30, 1963. They had prior rights to jobs at the Rock Island yard they worked at on their seniority date. 13 Will at 92, 127-28; 20 Koening at 48-53.
*1288 A designation of "prior rights" at a location or to a line gives the employee first preference to all jobs at that place in the seniority order for employees granted prior rights at that location. An employee who did not have prior rights at a location came behind all prior rights employees, regardless of his seniority date. For example, if three employees with seniority dates of 1976, 1977 and 1978 bid for a job, the employee with the 1978 date could win the job if he had prior rights at that location or to that line. 6 Swonger at 74-75; 8 Blackburn 136-37; 9 Huntington at 113-14.
SSW's seniority system differed from Rock Island's system. Unlike the brakemen and yardmen on the Rock Island, SSW's brakemen and yardmen combined crafts in October 1971. Thereafter, SSW abolished the multiple seniority districts on the line and operated the entire Corsicana Line as one seniority district. 10 Huntington at 76-77, 87; 20 Koenig at 78; Pls. Ex. 11E, addendum 39 at ง 1(a). The two distinctions created three classes of SSW employees: pre-'71 brakemen, pre-'71 yardmen and post-'71 dual rights employees. The pre-'71 hires in either craft held 1) prior rights in their old seniority districts or yards, 2) had a preference over any employee from the other craft to a job within their craft at any point along the entire Line and 3) could work in the other craft after those within the craft with pre-'71 dates exercised their seniority. The post-'71 hires were known as "dual rights" employees because they could work in either craft and had the same seniority date in either craft. The resulting pecking order worked as follows: a pre-'71 employee could defeat anyone within his old seniority district and could win jobs along the rest of the line against pre-'71 hires from the other craft and against all dual rights employees. 6 Swonger at 39-40; 20 Koenig at 38, 42-45; 22 Koenig at 87-89; 26 Raney at 125-26; 26 Braden at 139; 26 Beavers at 149; Pls. Ex. 11E at Addendum 39.

3. Combination of Seniority Rosters or Crafts
When one railroad is acquired by another, the purchasing railroad and the unions of the acquired line and the purchasing line must reach an agreement on the apportionment of seniority between the two groups of workers. The parties can combine seniority rosters from different seniority districts and/or different crafts by several methods. One method is called dovetailing. When two or more seniority rosters are dovetailed, all names on those rosters are listed on a single roster in seniority order. 5 Swonger at 62; 6 Swonger at 105; 12 Egbers at 62.
The dovetail may be a true dovetail โ the seniority on each roster is given equal weight. 6 Swonger at 105. If this arrangement is used, the employees on the acquired line will receive full "carryover" seniority rights. In essence, employees of the acquired carrier will carry over all of their seniority from their old employer to their new employer. In some cases, the acquired employees may carry over a fraction of their seniority rights when the two rosters are dovetailed. For example, the acquired employees could receive one-half of their seniority and then dovetail the two rosters. 7 Swonger at 55-57; 10 Huntington at 49-50; 12 Egbers at 49-51; UTU Ex. 214C at 10.
Another method of combining rosters from different carriers is to "endtail" the rosters. In an endtail, the roster of the acquired carrier is placed at the end of the roster of the acquiring carrier.
To combine crafts, a method often used is to "top and bottom" the rosters for each craft. When two rosters are topped and bottomed, one roster is placed at the bottom of another roster for work in one craft, and the process is reversed for the other craft. If brakemen's and yardmen's seniority rosters are topped and bottomed, the yardmen's seniority roster is put at the bottom of the brakemen's seniority roster for the allocation of brakemen's work; the brakemen's seniority roster is placed at the bottom of the yardmen's seniority roster for the allocation of yardmen's work. 5 Swonger at 65-66, 70-71; 6 Swonger at 102-05; 7 Swonger at 117-18; 10 Huntington at 116-17; 12 Egbers at 63; 13 Will at 119-20; 28 Hardin at 149-50. The parties *1289 can also agree to utilize several of the processes in combination. For example, a number of rosters in one craft could be dovetailed and then topped and bottomed with another dovetailed roster of a second craft. 22 Koenig at 87-88.

C. SSW'S PURCHASE OF THE ROCK ISLAND'S TUCUMCARI LINE
A brief history of the demise of the Rock Island and how SSW purchased the Tucumcari Line from the Rock Island Trustee is essential background information in order to place the March 4 agreement in context.
The Rock Island sought to reorganize in 1975 under the Bankruptcy Act. SPT-SSW filed a petition with the Interstate Commerce Commission ("ICC") in December 1978 to purchase the Tucumcari line. The financial health of the Rock Island continued to decline. The Federal Railroad Administration inspected and then placed severe speed and traffic limitations on the Line between Kansas City and St. Louis in July 1979 because of the poor condition of the track. SSWโPurchaseโRock Island, 363 ICC 320, 344 (June 6, 1980) (Finance Docket 28,799); Pls. Ex. 2. Rock Island employees went out on strike in August 1979.
With the strike continuing, SSW sought temporary authority from the ICC in September 1979 to operate the Tucumcari Line. Pls. Ex. 3A at 3. The Commission first ordered a directed rail carrier, the Kansas City Terminal, to operate the Tucumcari Line on a subsidized basis. K.C. TerminalโDirected to Operate Over Rock Island RR., 360 ICC 289, 290-91 (September 26, 1979). At the request of the Secretary of Transportation, the ICC later continued the subsidies granted to those railroads who temporarily operated portions of the Rock Island rail network until March 23, 1980. K.C. TerminalโDirected to Operate Over Rock Island RR., 360 ICC 478 (November 30, 1979).
The ICC then gave SSW temporary authority to operate the Tucumcari Line on December 6, 1979. SSWโTemporary AuthorityโRock Island, 360 ICC 539. SSW declined to operate the Tucumcari Line on the terms provided by the ICC and moved to modify the initial order. SSW received a partial victory from the ICC in its January 28, 1980 supplemental order. SSWโTemporary AuthorityโRock Island, 360 ICC 686. On January 25, 1980, the bankruptcy court rejected the Trustee's plan for reorganization of the Rock Island. The bankruptcy court recommended the Trustee begin liquidation in early March. In re Rock Island, No. 75 B 2697, Order No. 232, (N.D.Ill.1980).
Prior to and after the bankruptcy court's ruling, the federal government sought to work out a solution to the rail crisis. The Federal Railway Administration brought together labor leaders and interested purchasers of portions of the Rock Island and the Milwaukee Railroad [a second major railroad in bankruptcy proceedings]. They met to negotiate the labor protection obligations a purchasing railroad would owe the employees of either bankrupt railroad if a railroad purchased a portion of a bankrupt railroad. The negotiations resulted in an agreement signed on March 4, 1980. The March 4 agreement is described in section D. 2, infra, and analyzed extensively throughout the remainder of this opinion.
With the directed rail carrier's (Kansas City Terminal's) authorization to operate over the Tucumcari on a subsidized basis set to expire on March 23, 1980, the ICC moved to ensure continuous service over the Tucumcari Line. The Commission granted SSW's request to operate over the Tucumcari Line. SSWโTemporary AuthorityโRock Island, Directed Service Order No. 1453 at 4 (March 21, 1980); Pls. Ex. 3A at 4. The ICC imposed labor protective conditions, the March 4 agreement, in the directed service order. Id. at 8. SSW specifically requested that the ICC impose the March 4 protective provisions to their operation of the Tucumcari Line. SSWโTemporary AuthorityโRock Island, Directed Service Order No. 1411 at 5, 6 (March 14, 1980); Pls. Ex. 3 at 5, 6.
The ICC must impose conditions of operation to protect labor on railroads who apply to purchase another line. 49 U.S.C. *1290 ง 11347. The ICC can proscribe conditions or adopt conditions negotiated by the parties to meet this requirement. Id.
The Rock Island Trustee moved the ICC for permission to abandon the entire Rock Island rail system. The ICC recommended to the bankruptcy court that it allow the Trustee to abandon most lines. Rock IslandโAbandonmentโEntire System, 363 ICC 150, 152 (May 23, 1980). The Commission treated the Tucumcari Line in a very different manner, however. The ICC first described the proposed purchase of the Tucumcari Line by SSW for 57 million dollars and the pending status of the transaction before the ICC. Id. at 168. The Commission then noted the obvious: If the ICC approved the sale, the abandonment issue was moot. Id. The ICC elaborated:
The Bankruptcy Court should not take any action with respect to abandonment of the Tucumcari Line until the commission issues its final decision in the SSW purchase proceeding. Because a decision on the purchase application must be made by August 4 at the latest, and should, in fact, be reached before then, the abandonment proceeding would not be unduly delayed by awaiting that decision. If the purchase is approved and the parties consummate the transaction, there will be no need to give further consideration to abandonment of the Tucumcari Line by Rock Island. If the purchase is not approved, or if the parties chose not to consummate, then a reasonable opportunity should be given for another carrier, or other reasonable entity, to offer to purchase all or part of the line prior to decision on the abandonment.
Id. at 168-69. The ICC did not order the abandonment of the Tucumcari Line.
Several weeks later, the ICC approved SSW's application to purchase the Tucumcari Line. Pls. Ex. 2, SSWโPurchaseโ Rock Island, 363 ICC 323 (June 6, 1980). The ICC made several findings relevant to this action. First, the Commission reapproved the March 4 agreement as the labor protective conditions applicable to SSW's permanent acquisition and operation of the Tucumcari Line. While the ICC's imposition of the March 4 agreement is not made as clearly as it was in the temporary orders of March 14 and 21, 1980, the court's reading of the entire "Labor" section firmly convinces it that the ICC reimposed the March 4 agreement. 363 ICC 378-80. The ICC first described the genesis of the March 4 agreement and SSW's position on the agreements application to the Tucumcari Line.
As a result of the great uncertainty over the future of both RI [Rock Island] and Milwaukee, labor and management entered into an agreement for the protection of employees. The Hiring Agreement, entered into on March 4, 1980, provides protection for those employees of the bankrupt carrier hired by the purchasing carrier.... SPT and SSW believe that this agreement constitutes the degree of labor protection that should be afforded in this proceeding.

Id. at 378-79 (emphasis added).
The Commission then discussed the level of protection SSW employees affected by the purchase should receive: "SP employees affected by this transaction who are not expressly covered by the Hiring Agreement [March 4 agreement] must get the level of employee protection required by New York Dock." Id. at 380. The obvious implication is the ICC adopted the March 4 agreement for Rock Island employees and provided New York Dock protection to cover all workers not under the March 4 agreement โ SSW's existing employees.
Two key members of SSW's labor relations staff recognized that the ICC imposed the March 4 agreement as labor protective conditions when it approved SSW's purchase of the Tucumcari Line: C.R. Huntington, SSW's negotiator of implementing agreements on the Tucumcari Line, and his successor, Edward Koenig. 9 Huntington at 9; 23 Koenig at 20-21.
The ICC's other important findings concerned the Kansas City to St. Louis segment of the Tucumcari Line. The segment was inoperable in 1980 and precluded the Tucumcari Line from fully participating in *1291 transcontinental traffic. 363 ICC at 344. The ICC first emphasized the importance to SSW of reaching St. Louis:
St. Louis is a key point for transcontinental traffic. No individual rail carrier serves points on both coasts. As a result, eastern carriers interchange with western and midwestern carriers at several midwestern gateways. Chicago and St. Louis are the two principal gateways for east-west traffic. While Kansas City is served by most of the midwestern and western carriers, the only eastern carrier with access into Kansas City is N & W. By contrast, at St. Louis a western carrier can interchange not only with N & W, but also with ConRail, the Chessie System, the Family Lines System, and Southern Rail Company. Therefore, St. Louis is clearly preferable to Kansas City as the eastern terminus for any western carrier in the transcontinental market.
363 ICC at 343-44.
The Commission next explained the importance to SSW of reaching St. Louis via the Tucumcari Line. SSW had a very poor return on investment in 1977 and 1978 because it could not generate much "long haul" business โ lengthy routes are generally the most profitable. 363 ICC at 347. The ICC described the problem and how granting the purchase of the Tucumcari Line would likely solve SSW's financial woes:
There are three primary reasons SP cannot sell its long haul: the existence of the CP conditions, the decline of the RI and its Tucumcari line, and the circuity of the Corsicana route. The CP conditions bind SPT to solicit preferentially for the Ogden [Utah] gateway all traffic moving between points in CP territory. Existing CP territory can briefly be described as, on the west, points in southern Oregon and California north of Los Angeles, and, on the east, point in the Midwest as far east as Buffalo, Pittsburgh, and Wheeling, WV. For all traffic which SPT solicits moving between these points, it must preferentially solicit Ogden, which is its short haul [where SP traffic interchanges with the Union Pacific].
While SSW can solicit its Corsicana route in CP territory, the circuity of the route makes it less attractive than the central corridor, especially for time-sensitive goods. From southern California (non-CP territory), the Corsicana route is more attractive. However, even in that market goods moving to Kansas City and Chicago are transported via UP, ATSF or motor carriers. Prior to the decline of RI and the Tucumcari route, much of that traffic moved via SPT-RI.
Thus, despite its originating and terminating power SP finds itself forced to solicit much of its traffic for its Ogden shorthaul. This transaction will change that situation. SSW will now be able to solicit in CP territory for a good route to Kansas City, St. Louis, and Chicago. This route will be competitive with the overland route for much nontime-sensitive traffic. It will certainly be more competitive than the Corsicana route.
Further, from southern California SP will have an excellent long haul to compete with UP and ATSF. Its routes to and from Chicago, Kansas City and St. Louis will be time competitive. Additionally, its ability to connect with eastern carriers at St. Louis via a route 400 miles shorter than the Corsicana should enable it to capture a good deal of the southern California market for its long haul.
363 ICC at 347-48.
Finally, the Commission ruled it wanted SSW to substitute trackage rights for the Kansas City to St. Louis segment. The Commission reasoned:
The RI St. Louis/Kansas City segment is no longer essential for local shippers. There has not been any service on that segment since directed service began because of its poor physical condition. There is no evidence that local shippers require service on this line.
Instead the evidence and arguments address the necessity for SP to gain access to St. Louis via Kansas City. Towards that end, SP has tried unsuccessfully to negotiate trackage rights over *1292 either MP or N & W lines. SP acknowledges that it will continue to seek those trackage rights for its transcontinental traffic.
SSW states that, if it obtains trackage rights, it will continue to provide local service over the RI segment. It is willing to agree not to abandon the line for 10 years. SSW expresses a belief that the Nation's growing transportation needs require that the RI segment be available in the future.
We are not as convinced as SSW that the RI Kansas City/St. Louis segment will ever again be a necessary part of our Nation's transportation system. But we do believe SP should be able to serve the St. Louis gateway via Kansas City. We agree with applicants that without a grant of this portion of the application, neither MP nor N & W will have any incentive to negotiate with SSW for trackage rights. We do not believe DOT's suggested 120 day grace period will give these carriers added incentive to negotiate. Therefore, we will grant the entire application to St. Louis. We will not condition such a grant on a commitment not to abandon the segment for 10 years.
Id. at 357 (emphasis added). The Commission concluded the Kansas City to St. Louis segment would not be used by SSW and that SSW must have trackage rights over some other line to allow its traffic to reach St. Louis.

D. THE MARCH 4 AGREEMENT

1. Background
A further predicate to understanding the March 4 agreement is to recognize what labor protective conditions were normally imposed by the ICC in 1980 and what conditions labor and management preferred. In acquisitions or mergers, the ICC usually imposed the New York Dock conditions, 360 ICC 60 (1979); when granting trackage rights (leases allowing one railroad to send its trains over the line of another railroad), the ICC usually imposed the N & W-BN conditions, 354 ICC 605 (1978). 11 Egbers 36-37 (Egbers was a Burlington Northern officer and chief spokesman for the railroads at the March 4 agreement negotiations. 11 Egbers at 28.). The two sets of conditions had many similarities. An employee adversely affected by the transaction could receive a wage guarantee of up to his full salary for up to six years under either set of conditions. 11 Egbers at 22-23. The two labor protective provisions had similar procedures for negotiating implementing agreements. An implementing agreement generally covers subjects like the number of employees affected by the transaction, seniority or work rules. Id. at 21-22.
The key difference between the two sets of conditions was the time sequence for reaching an implementing agreement. Under New York Dock, the purchasing carrier could not commence operations on its new line until it made an implementing agreement with labor. Id. Under N & W-BN, the lessor carrier could commence operations without reaching an implementing agreement with labor. 9 Huntington at 80-81; 11 Egbers at 21-23; 28 Hardin at 110-11 (Hardin became President of the UTU in 1980 and continues to hold that position.). Railroads preferred the N & W-BN conditions because they provided no impediments to immediate operation of the new line. 12 Egbers at 98-99; 23 Koenig at 20. Labor preferred New York Dock because the requirement of an implementing agreement prior to beginning operations allowed for delay and a potential means to extract more favorable terms. 12 Egbers at 98-99; 23 Koenig at 20.
A second background fact to the March 4 negotiations was the demise of the Milwaukee Railroad. Like the Rock Island, the Milwaukee was in bankruptcy in early 1980 and facing liquidation by its Trustee. Congress passed legislation to assure the sale of the Milwaukee and to provide benefits to Milwaukee employees in November 1979. Milwaukee Railroad Restructuring Act, 45 U.S.C. งง 901-922. The legislation provided for the "first right of hire" for furloughed Milwaukee employees with any railroad. 45 U.S.C. ง 907. The benefit to unemployed Milwaukee workers was not as great as one would think. A railroad hired *1293 new employees only after it recalled its own furloughed employees. Id. Milwaukee employees did have preference over unemployed workers of other railroads and people off the street. Id.
With the Milwaukee and Rock Island in bankruptcy, the Federal Railroad Administration ("FRA") sought a settlement of the situation. The FRA had two goals: it wanted to prevent the elimination of rail service to the many areas of the country served by the two railroads; it also sought to ensure the subsequent hiring of many Rock Island and Milwaukee employees to prevent a drain on the federal treasury. 11 Egbers at 31-32, 44-47; 12 Egbers at 14; 28 Hardin at 101. The FRA convened a meeting in late January 1980 of railroads interested in purchasing parts of either bankrupt railroad and labor representatives from the crafts employed by the Rock Island and Milwaukee. The initial meeting was fruitful and the parties agreed to meet in Miami on February 11.
The railroads' objective in negotiating with labor was to reach a low cost labor protective agreement before purchasing pieces of the bankrupt railroads. If a purchasing railroad had an agreement in hand, it could accurately determine what its labor costs would be on the new line. Of course, the railroads also wanted to keep the labor costs of any agreement low. Thus, they adamantly opposed an imposition of New York Dock conditions because of the required six years of compensation payments to workers of the purchased line. New York Dock was simply too expensive. New York Dock conditions prevented a railroad from commencing operations without an implementing agreement.
The railroads also sought to hold down labor costs by employing their own furloughed men on the line they purchased. The railroads best scenario was to employ furloughed men on their new line instead of hiring employees of the purchased line and continuing furlough payments to their old employees. 11 Egbers at 33-34, 37-38, 52-53; 12 Egbers at 13-15. For example, during the March 4 agreement negotiations, William Denton, SSW-SPT labor official, wanted to activate his furloughed men and then hire Rock Island employees for the remaining positions on the Tucumcari Line. 11 Egbers at 52-53 (February 1, 1980).
Labor wanted the converse: it wanted the railroads to hire as many Rock Island and Milwaukee employees as possible and for those not employed by a purchasing carrier to receive some sort of protective pay. 29 Hardin at 22-23; 12 Egbers at 14; See UTU Ex. 219gg at 1. The chief spokesman for the railroad unions was Bill Mahoney, an attorney for the Railway Labor Executives' Association. 11 Egbers at 29.
The meeting in Miami in early February resulted in an agreement on 13 major principles, sometimes referred to as the "Miami Accord." 11 Egbers at 55. The negotiators for both sides reconvened in Washington, D.C. from February 22-25 to draft a formal agreement. The negotiating teams for each side prepared four drafts of an agreement on February 22-23. SSW Exs. 1D, 1K, & 1L; 11 Egbers at 64-66. On February 25 at a meeting attended by more representatives from each side, the parties adopted additional changes. SSW Exs. 1H & 1I; 11 Egbers 60-63. The court will address the specific drafting history of various provisions in the next section. Executives of 13 railroads and 14 labor organizations signed the agreement on March 4, 1980. Pls. Ex. 5 at 15-17 (The court will generally refer to only the article and section number hereunder when citing to the March 4 agreement.).

2. Key Provisions of the March 4 Agreement
Article I of the agreement dealt with "General Provisions." The agreement defines "purchasing carrier" as a railroad who purchases a part of the Rock Island and "bankrupt carrier employee" as "any person with an employment relationship (i.e., in active service or on furlough) with the Rock Island ... as of the date of this agreement." Art. I, ง 1(a), (e). The purchasing carrier owed a labor protective obligation to bankrupt carrier employees it *1294 employed; it owed no duty to bankrupt carrier employees it did not hire. Art. I, ง 2. A purchasing carrier had to notify the employee representatives of the bankrupt carrier employees and its own employes of any transaction covered by the March 4 agreement. Art. I, ง 3. Thereafter, the purchasing carrier had to notify and negotiate with the representatives from both groups when determining its need for additional employees and in providing notification of an intent to hire more employees. Art. I, ง 3; Art. II, งง 2, 4. See, infra, section E.1.
Article II covers hiring and work rules; it contains the contract provisions at issue in this suit. The first section establishes who is eligible for hiring: "All employees of the Rock Island or Milwaukee who held seniority on the effective date of this agreement in a craft represented by one of the labor organizations signatory hereto shall be eligible for participation in the hiring procedures described in this Article." Art. II, ง 1.
Section two of Article II gives the purchasing carrier the unilateral right to "determine its necessary additional manpower requirements by craft due to its taking over those Rock Island and Milwaukee Lines." (emphasis added). In filling its additional manpower requirements, the purchasing carrier cannot initially utilize its furloughed employees. "If a purchasing carrier has employees on furlough they will not be subject to recall as a result of the additional manpower requirements resulting from a transaction, until after bankrupt carrier employees on appropriate seniority rosters have exhausted their opportunity to be hired hereunder." (emphasis added). The fourth draft of the agreement did not include the emphasized, concluding phrase. The parties added the emphasized language in the larger negotiating session on February 25. SSW Ex. 1N (A compilation by Egbers of the revisions of Art II, ง 2 in the various drafts negotiated by the parties.).
The third section of Article II is entitled "Preferential Hiring." Once the carrier has made its determination under ง 2 of its need for additional manpower,
it [the purchasing carrier] shall allow eligible employees in seniority order on the Rock Island or Milwaukee the first right of hire respectively, dependent on whose trackage is involved,.... In carrying out the purposes of this section, the purchasing carriers shall first utilize existing seniority rosters applicable to the appropriate craft and seniority district for the lines and territories involved in fulfilling employment needs in connection therewith.
Art. II, ง 3 (emphasis added).
The fourth section describes the procedure the purchasing carrier and bankrupt carrier employees should use in carrying out the first right of hire granted in ง 2. In determining the hiring priority among a large number of applicants from a bankrupt carrier, "(t)he applicant's seniority in the appropriate craft and seniority district on the bankrupt carrier will prevail if the number of qualified applicants exceeds the carrier's determined need for additional employees." Art. II, ง 4.
Section five states the length of the hiring procedures of Article II. The parties agreed on the final language on the second draft: "The procedures established in this Article shall continue in full force and effect for not less than one year from the effective date from the commencement of operations or as otherwise provided for by law, but in no event beyond April 1, 1984." Art. II, ง 5. The first draft was more limited; it stated: "The procedures established in this Article shall continue in full force and effect for one year from the effective date of this agreement." SSW Ex. 1P.
Sections 8 and 9 of Article II dealt with work rules and seniority. The March 4 agreement abolishes the work rules and labor contracts of the bankrupt carrier. The purchasing carrier did not assume any labor contracts of the bankrupt carrier, ง 8(a); an employee of a bankrupt carrier hired by the purchasing carrier came under the purchasing carrier's work rules and labor contracts. ง 8(b).
*1295 Under section 9(a), labor and management had to negotiate the seniority arrangement between the newly hired bankrupt carrier employees and the employees of the purchasing carrier. Seniority allocation was too difficult and varied a subject to resolve in a single master agreement. Therefore, the March 4 agreement gives management two general options in handling seniority. งง 9(a) & 8(c). First, the purchasing carrier can commingle work from the bankrupt carrier's line with its own. Most simply, the purchasing carrier could expand an existing seniority district to include the line acquired from the bankrupt carrier. ง 8(c)(1). Alternatively, the purchasing carrier could "operate the acquired property as a separate seniority district or districts under the purchasing carrier's work rules." ง 8(c)(2).
Once the purchasing carrier selects the seniority system it wishes, "agreements will be reached ... concerning the manner in which seniority will be allocated in filling additional job assignments, between the purchasing carrier's employees and the bankrupt carrier employees hired by the purchasing carrier." ง 9(a). If the parties could not reach an agreement, labor or management could send the issue to arbitration. ง 9(b).
At the time an implementing agreement on seniority is concluded, the bankrupt carrier employees "hired by a purchasing carrier will be considered as having severed their employment relationship with their former employer." ง 7. A bankrupt carrier employee does not change employee status until hired by the purchasing carrier. Id.; accord, UTU Exs. 234D & 234E (ง 7 interpreted and relied on by UTU Pres. Fred Hardin in April 1982).
Article III provided a monthly compensation guarantee to all Rock Island employees hired by the purchasing carrier and subsequently furloughed. The protection pay was equal to 80% of a bankrupt carrier employee's 1979 wages. The purchasing carrier had no protective pay obligation to bankrupt carrier employees it did not hire. Art. III, ง 1.
The Rock Island employees not hired by a purchasing carrier were to receive protective pay under legislation pending before Congress at the time of the March 4 agreement negotiations. 28 Hardin 102-03. Fred Hardin explained the connection between the March 4 agreement and the pending legislation in an article in the UTU News, the official publication of the UTU, four days after he signed the March 4 agreement:
"Under all the circumstances involved we feel that we did come out with the absolutely best protection that we could obtain โ both for the employees who will be hired in seniority order by the acquiring railroads, and also those who will not be offered employment," Hardin emphasized.
He explained that severed employees will have the protection provided for in the legislation "we are assured will be enacted within a few days."
Because the agreement and the pending legislation are interconnected, said Hardin, a full explanation of the protection and other benefits will be forthcoming as soon as the legislation is enacted into law, hopefully within a week.
UTU Ex. 219gg at 1 (March 8, 1980).
Congress passed the legislation, although not as quickly as Hardin estimated. Rock Island Railroad Transition and Employee Assistance Act ("RITEA"), Pub.L. No. 96-254, 94 Stat. 399 (May 30, 1980), 45 U.S.C. งง 1001-1018. The legislation required the Rock Island Trustee to give Rock Island employees not hired ("non-hires") significant monetary benefits. RITEA directed the Trustee to 1) provide protective pay to non-hires and 2) consider the protective pay "administrative expenses" of the Rock Island bankruptcy estate. The later provision gave the non-hires first preference in the bankruptcy proceedings to up to 75 million dollars. 45 U.S.C. งง 1005 & 1008.
The non-hires never received any of the $75 million. Rock Island creditors challenged these two sections on constitutional grounds and immediately received a preliminary injunction. Railway Labor Execu- *1296 tives' Assoc. v. Gibbons, 455 U.S. 457, 463, 102 S.Ct. 1169, 1173, 71 L.Ed.2d 335 (1982). The Supreme Court declared the two provisions unconstitutional less than two years later. The two sections violated the Constitution's mandate that Congress pass "uniform" bankruptcy laws under Art. I, ง 8, cl. 4. Id. at 465-72, 102 S.Ct. at 1174-78.
RITEA also included a preferential hiring section for Rock Island employees identical to the one in the Milwaukee Act. 45 U.S.C. งง 1004, 907. Both sections gave employees of the two bankrupt carriers the first right of hire on any railroad after the railroad has reemployed all of its furloughed employees. 45 U.S.C. งง 907, 1004.

3. March 4 Agreement Interpretation Events
Defendants contend the March 4 agreement required it to do two things: 1) SSW had to extend the first right of hire to those on the Rock Island point seniority roster where SSW needed additional manpower, e.g., the Dalhart roster for manpower needs at Dalhart, and 2) SSW needed to extend the first right of hire for one year, until March 4, 1981. Defendants derive their claims from 1) the drafting history and final language of the last sentences of งง 2, 3 & 5 of Article II and 2) the testimony of Al Egbers and Fred Hardin regarding งง 2, 3 & 5. Dkt. 200, SSW FF at 32-41, 41-46; Dkt. 201, UTU FF at 29-42, 42-48; Dkt. 210, SSW Response at 2-13.
The court has thoroughly reviewed the exhibits and testimony cited by defendants on these major interpretive questions. As explained below, the court cannot concur with much of defendants' interpretations or generally subscribe to the testimony of Egbers and Hardin on these points. The court is guided in its evaluation of the facts by several elementary, evaluative precepts. Documents, especially if contemporaneous to events, are more probative than trial testimony eight years later. Actions speak louder than words; if a witness or a party takes action long before litigation is contemplated, this action is more probative of intent or meaning of the contract than trial testimony. The credibility of a witness or the validity of an assertion made by a party at trial is measured against all prior facts and statements of the witness or party. The court will now discuss facts relevant to the hiring provisions of Article II.

a. First Right of Hire
The meaning of the last sentences of งง 2 & 3 on hiring first from the "appropriate rosters" is developed most convincingly from studying the practices of SSW and UTU in the period immediately after the signing the March 4 agreement. As detailed in section E. 2, infra, SSW did not follow the interpretation it advances now when it hired temporary or permanent employees on the Tucumcari Line in 1980-1982. SSW hired Rock Island employees at the point roster until exhausted and then hired in seniority order from the other terminals to meet its additional manpower requirements. For example when hiring roadmen, if the Dalhart roster did not meet SSW's employment requirements at Dalhart, SSW went up the line to Pratt, Herington or Eldon to find the most senior unemployed Rock Island roadman to fill the position. Unlike the interpretation SSW offers now, it did not utilize furloughed men from the Pine Bluff Division to fill any positions when the point seniority rosters at Dalhart and Pratt were exhausted in 1980-82. UTU representatives participated in this process without raising any opposition to SSW's hiring practices.
In addition to its actions with the Rock Island roadmen in 1980-82, SSW also entered into implementing agreements during the same time period with other crafts on the Tucumcari Line that directly conflict with the position it espouses today. On January 2, 1981, K.R. Peifer, an SSW-SPT labor official, wrote to SSW managers including J.E. Hare, superintendent of the Kansas City Division. Pls. Ex. 11D. A copy of the letter was sent to the SSW labor relations officials who negotiated with the road and yardmen on the Kansas City Division, C.R. Huntington and W.L. Cowan. Id. at 4. The memo set out the hiring procedures to use to hire non-temporary employees pursuant to the March 4 *1297 agreement. Id. at 1, ถ 1, at 3, last ถ ("(T)he obligation to hire former Rock Island employes emanates from the March 4, 1980 Preferential Hiring and Protective Agreement....")
Peifer outlined the hiring procedures negotiated with each craft for filling additional employment requirements. In crafts with seniority arrangements like the roadmen, multiple seniority districts covering one line, SSW agreed to first exhaust the seniority roster where the vacancy existed and then hire from a consolidated seniority roster of the remaining districts on the line. Id. at 1-3 (clerical employees, engineers and mechanical employees). For example, the implementing agreement with the Brotherhood of Engineers provided:
"the following procedures will be followed to fill the vacancy
1. In seniority order, those unemployed engineers on the prior rights district where the vacancy exists will be given employment preference.
2. In relative seniority order, unemployed engineers from the Dalhart, Pratt, Herington and Eldon prior rights districts will be given employment preference.
3. In relative seniority order, engineers hired for the rehabilitation project will be given employment preference. Engineers employed in connection with the rehabilitation program will be considered unemployed for the purpose of applying.... [the above section]
4. In relative seniority order, providing they meet the Carrier's minimum physical standards and were not discharged from the Rock Island as of March 24, 1980, unemployed former Rock Island engineers from points other than on the Tucumcari Line will be given employment preference."
Id. at 2. The agreement with the engineers is set out in full in Pls. Ex. 88.
The clerks negotiated a similar arrangement in their implementing agreement with SSW:
"In filling the vacancies, first preference will be given to those individuals carried on the appropriate Rock Island district encompassing the territory where the manpower is needed. Second, preference will be to other Rock Island districts covering the Tucumcari Line and last preference to Rock Island districts removed from the Tucumcari Line."
Pls. Ex. 11D at 1; 1 Nuss 61-64 & 69-70 (Clerk's local chairman describes seniority districts and implementing agreements). SSW's hiring of future mechanical employes followed a similar procedure:
"Vacancies and/or new positions will be filled by eligible former Rock Island employes holding seniority on the point seniority roster for the location at which the vacancy and/or new position exists. After the point seniority rosters have been exhausted, the respective General Chairman will provide the name of the next eligible employe."
Pls. Ex. 11D at 2.
The court is convinced by the actions of SSW in the year after the signing of the March 4 agreement that it understood the first right of hire provisions of the March 4 agreement extended first to the seniority roster at the location where the additional manpower was needed, then to the rest of the rosters on the line in that craft. Other Rock Island employees received preference under RITEA.

b. Duration of the March 4 Agreement
The trial testimony and current claims of both defendants that the first right of hire provisions in งง 2 & 3 of Article II automatically expired on March 4, 1981, under ง 5, is also belied by their earlier actions and statements. Numerous SSW or railroad officials recognized that the March 4 provisions extended until April 1, 1984. Peifer, in his January 1981 memo on hiring under the March 4 agreement, concluded: "The duration of the Preferential Hiring provided for in the March 4, 1980 Agreement continues in effect until April 1, 1984." Pls. Ex. 11D at 4 (emphasis added).
William Denton, vice-president for industrial relations at SSW, explained that the March 4 agreement extended to April 1, 1984. Denton Depo. at 53-54. Huntington, SSW's chief negotiator with the road *1298 and yardmen on the Tucumcari Line, explained that SSW's first implementing agreement proposal in June 1980 terminated the first right of hire provisions for Rock Island employees on March 31, 1984. Huntington Depo. at 41-42. SSW's implementing agreement with the Brotherhood of Engineers in December 1980 provided for an April 1, 1984 termination date of the preferential hiring provisions. Pls. Exs. 50 & 88 at ง 7.
SSW relies heavily for its Art. II, ง 5 one year argument on the testimony of Al Egbers, a Burlington Northern official. Burlington Northern, in an arbitration concerning the implementing agreement to cover a purchased segment of the Milwaukee railroad, recognized that the March 4 agreement extended until April 1, 1984. UTU 214C at 14, UTU and Burlington Northern Railroad Co., Arbitration Bd. No. 416 at 14. SSW's position on this issue is undercut by railroads' prior actions.
The UTU recognized the applicability of the preferential hiring provisions for a full four years. As detailed in section E. 3, infra, the representatives of the Rock Island employees and Pine Bluff Division employees met at Cleveland, Ohio in July 1981 to resolve competing positions. The implementing agreement UTU proposed at the conclusion of the meeting terminated the March 4 provisions on April 1, 1984. Pls. Ex. 13 at 3-5. Robert Crago, a UTU vice-president present at much of the March 4 negotiations, also recognized the March 4 procedures lasted until April 1, 1984. Crago Depo. at 15-17, 28.
Both defendants recognized the correct termination date of the March 4 hiring provisions in the February 23 implementing agreement. Pls. Ex. 19 at งง 1(d), 2(e), 2(f), 4, 5. SSW and UTU wrote the February 23 agreement pursuant to the March 4 agreement almost one year after they both now claim the March 4 agreement expired. Id. at 1 and 3.

c. Hiring Additional Employees For Increased Business
The March 4 agreement applied for four years to account for additional manpower requirements that occurred as a result of the purchase of a line from a bankrupt carrier. Both railroad and union officials recognized the obligation to hire bankrupt carrier employees due to an increase in business along the line attributable to the purchase of the line until April 1, 1984. 12 Egbers at 84-87; Crago Depo. at 28, 163-67; Denton Depo. at 49-50; UTU 214C at 14, UTU and Burlington Northern Railroad Co., Arbitration Board 416 at 14 (BN proposes two methods to provide for hiring Milwaukee employees due to an increase in business after the implementing agreement is signed.).
The March 4 Committee was a group with representatives from labor, management and government; it was formed to provide interpretations of the March 4 agreement for the myriad situations created by the many purchases of parts of the Rock Island or Milwaukee systems. Railroads or unions would submit questions to the Committee who would formulate and publish answers. See Pls. Ex. 104 at 1, 2 (May 27, 1980 Hardin to General Chairman). While the recommendations of the March 4 Committee did not bind any entity, the court finds the Committee's interpretations generally persuasive because of its composition and the short elapse of time between the signing of the March 4 agreement and the interpretations provided by the Committee.
The Committee addressed the increase in employment over time question less than a year after the signing of the agreement:
Do former Rock Island employees have preference to work over furloughed employees of a purchasing carrier or interim operator due to [an] increase in traffic?
The answer to this question depends upon the cause of the increase in traffic. If the increase in traffic results from the acquisition of the Rock Island line, the Rock Island employees would have preference to work over furloughed employees of the purchasing carrier or interim operator. If, however, the increase in traffic is not due to the purchase of the Rock Island property but from other factors, former Rock Island employees *1299 would not have preference to work over furloughed employees of the purchasing carrier or interim operator.
Pls. Ex. 6B (February 4, 1981) at Q. 4; accord Pls. Ex. 6A (June 2, 1980) at Q. 10 ("If manpower requirements are increased because of the purchased property, the additional manpower should come from the Rock Island or Milwaukee, as the case may be.").

E. EVENTS BETWEEN MARCH 4, 1980 AND FEBRUARY 23, 1982

1. The Appointment of Representatives to Negotiate Hiring on the Kansas City Division
The March 4 agreement provided for former Rock Island or Milwaukee employees to receive information about the carrier's determination of increased manpower needs. The agreement also provided that former Rock Island or Milwaukee employees and the current employees of the purchasing carrier would have separate representation when negotiating an implementing agreement. Art. I, ง 3, Art. II, งง 2, 4 and 9. Numerous officials recognized the dual representation requirement. Crago Depo. at 43, 44, 58-59; Huntington Depo. at 68-69; Pls. Ex. 5B (explanatory memorandum by union attorneys written shortly after the March 4 agreement) at 2 ("The acquiring carrier and union representatives of the Rock Island and Milwaukee employees, as the case may be, will negotiate all issues involving the seniority of employees hired from the bankrupt railroad."); Pls. Ex. 6D (March 4 Committee memo of March 30, 1984) at Q. 5; Pls. Ex. 88 (SSW-Brotherhood of Engineers implementing agreement signed by Rock Island representative on December 12, 1980); UTU Ex. 214A (Burlington-Northern & UTU implementing agreement, January 15, 1981, signed by labor representatives from both BN and the Rock Island); UTU Ex. 214B (Burlington-Northern, Inc. v. UTU, Arbitration Board No. 397 at 4-6, September 8, 1981, participation by BN and Milwaukee labor representatives); UTU Ex. 214C (Burlington-Northern, Inc. v. UTU, Arbitration Board No. 416 at 5-7, February 10, 1984, same).
The various parties began immediately to implement the dual representation provisions. On March 10, 1980, William Denton, SSW labor official, wrote to Hardin, UTU president. Denton stated SSW would inform Rock Island general chairman of manpower needs and hiring procedures (Art. I, ง 3 disclosure). Denton also requested UTU to inform SSW who would represent labor in the seniority allocation negotiations (Art. II, ง 3 procedure). Pls. Ex. 7. Two weeks later, Hardin advised SPT and SSW that "(t)he designated representatives of the United Transportation Union for Labor relations matters in connection with SSW's operation of the "Tucumcari Line" and/or other portions of the Rock Island system are as listed on attachment." Pls. Ex. 7A. The representatives designated on the attachment for SSW employees were George Perkins, UTU international vice president; and Robert Arnett, general chairman. Id. The designated Rock Island representatives were Robert Crago, UTU vice president; Ralph Tambaro, roadmen general chairman; W.R. Myers, general chairman; M.R. Alamprese, yardmen general chairman. Id.
Hardin appointed Crago from the international because most Rock Island general chairman lacked sufficient funds to travel. 5 Swonger at 55-56; 28 Hardin at 124; Crago Depo. at 21. Crago became the principal representative for the Rock Island brakemen, Alamprese for the Rock Island yardmen and Arnett for the Pine Bluff Division employees. 9 Huntington at 36-37; 10 Huntington at 41; 30 Arnett at 82-83; Crago Depo at 20-21, 121-24; Pls. Ex. 10 (Crago to Cowan, May 19, 1981, Crago officially replacing Tambaro); Pls. Ex. 105 (Perkins to Hardin letter, September 5, 1980).

2. Commencement of Operations on the Tucumcari Line
When SSW purchased the Tucumcari Line, it was in poor condition and needed substantial rehabilitation. 5 Swonger at 48-49; 6 Swonger at 50-51; Pls. Ex. 2, 363 ICC 323, 325, 357. SSW immediately began work on the Line west of Kansas City. *1300 By late 1981 or early 1982, the bulk of the work on the western portion of the line was complete at a cost of $97 million. 9 Huntington at 75; 23 Koenig at 71; Dkt. no. 86, Pretrial Order stipulation at 9.
SSW hired both permanent and temporary workers during the rehabilitation period. The temporary employees performed much of the rehabilitation work and the permanent employees worked the through freight trains that traversed the Line to Kansas City. 7 Swonger at 31-34; 13 Jones at 35-36; 15 Donahue at 18, 54-55; 15 Volkman at 134-35; 18 Wade at 94-95. SSW hired temporary employees under a series of implementing agreements. The first agreement provided for hiring at a terminal in the following order: in seniority order from that terminal's roster and in seniority order from the remaining terminals on the Tucumcari Line. Pls. Ex. 9, October 3, 1980 agreement at ง 2. The parties amended the agreement to allow for the hiring of yardmen if the trainmen's rosters were insufficient to meet SSW's needs. Pls. Ex. 9, Cowan to Arnett, December 19, 1980. Some yardmen did work temporarily as brakemen. 17 Schneider at 17; 22 Koenig at 28. If neither the brakemen's rosters or the yardmen's roster were adequate for SSW's manpower requirements, the parties would meet to discuss the situation. Pls. Ex. 9.
The parties maintained the same hiring priority system for roadmen in a subsequent agreement signed by Crago for the UTU. Pls. Ex. 9B, February 17, 1981 agreement at ง 7 and page 3. Crago continued to manage the situation of the temporary employees. Pls. Exs. 10C, 10A & 10B (Crago and Cowan correspondence on the terms and expiration of the rehabilitation agreements during May and June 1981).
As noted above, SSW hired former Rock Island brakemen and yardmen for "permanent jobs" to operate through freight trains from March 24, 1980 onward. UTU Exs. 229 & 229A to 2290. SSW and UTU considered the jobs permanent because they represented the manpower necessary to handle the number of trains usually operating over the Tucumcari Line. SSW's hiring for permanent positions was in the manner provided in Article II of the March 4 agreement. 5 Swonger at 68; 8 Blackburn at 103-04; 15 Volkman at 135-36; 18 Wade at 94-95; 30 Arnett at 55-58; 32 Goodwin at 43-44.
SSW used hiring procedures for permanent roadmen positions identical to those used to hire temporary roadmen. For vacancies at a given terminal, SSW first exhausted the roster at that terminal and then hired the next most senior unemployed person from the remaining three terminals. The practical application of these procedures in 1980-1982 worked as follows. SSW's manpower requirements quickly exhausted the Pratt and Dalhart brakemen's rosters. SSW then hired from a dovetailed roster of unemployed Herington and Eldon Rock Island brakemen. Thus by mid-1982, SSW had hired all Dalhart and Pratt brakemen while a substantial number of Herington and Eldon brakemen remained unemployed. 5 Swonger at 110-11; 6 Swonger at 71-73; 7 Swonger at 75-76, 78-79, 140; 8 Blackburn at 103-07; 10 Huntington at 101; 13 Jones at 69-70; 16 Volkman at 56-57, 81; 18 Wade at 94-95; 19 Reavis at 12-14; 20 Koenig at 58; 32 Goodwin at 48-49; UTU Exs. 223A, 223B, 223C.
The two eastern Rock Island rosters were not exhausted for several reasons. First, SSW did not operate any through freight trains between Kansas City and St. Louis and therefore hired only a few men at Eldon to operate a local train. 8 Blackburn at 130-32; SSW Ex. 33. Second, the Herington roster was larger than the other rosters on the line because it included Rock Island employees not employed on the Tucumcari Line. Two other Rock Island lines went through Herington: one, a north-south line and the other ran west to Salina, Kansas and east to St. Joseph, Missouri. SSW acquired neither line nor hired Rock Island employees from either line.
SSW's hiring of Rock Island employees from a Tucumcari Line roster other than the one where the employee was needed is reinforced by the beneficial treatment given *1301 to out of district hires in a 1981 temporary operating agreement. Pls. Ex. 9A (February 17, 1981 agreement). First, those hired from another seniority district could lay off for 3 days after working 10 days, apparently to facilitate travel. Id. at ถ 2. Second, the agreement allowed a person who took a job outside his Rock Island seniority district to return to his prior rights district when his seniority allowed. Id. at ถ 6. Third, "(t)rainmen will not be required to accept permanent employment or temporary employment on other than their prior rights seniority district...." Id. at ถ 2.
SSW expanded its March 4 additional manpower requirements throughout 1980 and 1981. On several instances, labor and SSW agreed to convert temporary employees to permanent employees. Pls. Exs. 9A at ถ 4; 10A at 1; 10B; 10D; 11. By July 1981, SSW and labor agreed on the number of brakemen necessary to handle the trains operating after most rehabilitation work was completed but before the line opened to St. Louis. This represented the basic pre-trackage rights level of employment. The number of brakemen at each terminal was 43 at Dalhart, 39 at Pratt and 20 at Herington. Pls. Exs. 10D (Cowan to Crago and Arnett, June 29, 1981) and 53 (Crago to Hardin, December 24, 1982, explaining employment levels in July 1981); 22 Koenig at 134-35. Some erosion of the permanent jobs may have begun in early 1982. SSW Ex. 153 (Cohan to Arnett with cc to Crago, January 25, 1982, concerning the loss of three permanent positions at Dalhart).
An exception to the hiring practices described above occurred in March 1980 when SSW took over operation of the Tucumcari Line. SSW hired three brakemen from the Rock Island's Amarillo, Texas roster, a non-Tucumcari Line roster, and a Rock Island fireman for Dalhart brakemen's jobs. 7 Swonger at 119-21, 128-30, 135-39; 13 Jones at 29-40, 69-70, 15 Volkman at 96-100; 20 Koenig at 54-58; 31 Arnett at 79-82; Pls. Exs. 120 & 120A-120L. Herington brakemen protested this hiring practice at implementing agreement negotiation sessions in the fall of 1980 and directly to UTU president Hardin in January and March 1981. Pls. Exs. 120G-120L. A second exception to SSW's general hiring practices during 1980-1982 occurred in July 1982. SSW used employees from the Pine Bluff division to work eight positions at Pratt for a few months. 5 Swonger at 97-100; 7 Swonger at 78-79; 15 Donahue at 54-55.
At the commencement of operations in March 1980, SSW hired yardmen from the Tucumcari Line for yard jobs on the Line. SSW continued this practice at all times during 1980-84. SSW never used furloughed Pine Bluff Division employees for yard jobs on the Tucumcari Line. 10 Huntington at 132-33; 13 Will at 125; 30 Arnett at 63.

3. SSW โ UTU Implementing Agreement Negotiations
SSW proffered the first proposed implementing agreement in June 1980. The conductors, brakemen and yardmen already hired would receive prior rights where hired and an SSW system seniority date of March 24, 1980. Pls. Ex. 11 (June '80 proposal) at ง 2. SSW would place the conductors' seniority roster and a dovetailed brakemen and yardmen seniority roster at the bottom of its current roster. Id. If SSW needed additional employees to handle traffic on the Tucumcari Line, SSW would hire from a dovetailed Rock Island road and yard roster โ one seniority roster for both crafts. Id. at งง 2 & 3; 7 Swonger at 105-14; 10 Huntington at 39-40.
SSW's proposal contemplated an increase in traffic over the Tucumcari Line. If a train included traffic attributable to the Tucumcari Line and traffic diverted from an SSW line, SSW would assign crews based on which line was responsible for the preponderance of the work. Pls. Ex. 11 at ง 4(b). Rock Island employees hired for any additional work would receive prior rights in the territory hired. Id. at ง 3(a); 9 Huntington at 31-32, 111-14.
SSW's proposal for future hiring would have allowed any person to cross crafts for a vacant position based on his seniority date. 6 Swonger at 107-08, 113-14; 10 *1302 Huntington at 42-43. Unlike the SSW system after 1971, the SSW proposal did not recognize the existing prior rights an employee held within a craft and seniority district. For example, SSW's proposal gave no preference for Pratt brakemen's jobs to Pratt brakeman or Tucumcari Line brakemen. 7 Swonger at 39-40; 22 Koenig at 87-94.
Rock Island employees opposed SSW's June 1980 proposal because it would reduce the hiring of roadmen in theory and practice. Arnett transmitted SSW's proposal to Rock Island local chairman on July 10, 1980. 30 Arnett at 66; Pls. Ex. 51. The Herington road and yard locals met with Arnett to discuss the proposal. All members of both locals expressed opposition to the proposal. 13 Will at 101-02. The roadmen opposed it because yardmen could hold road positions in violation of the March 4 agreement. 13 Will at 102; UTU Ex. 267A at 1 (Herington roadmen's local chairman, K.K. Ekart, to Crago, Arnett and Tambaro, August 16, 1980). Yardmen opposed the straight dovetail because "it just wasn't fair for a [yard] man to acquire a job ahead of a roadman on this line because we had not had that previously." 13 Will at 102. Arnett also opposed the straight dovetail provision of the proposal. Id.; 30 Arnett at 14-15.
Negotiations continued in the fall of 1980 and early 1981. 30 Arnett at 7. At an April 1981 negotiating session, Crago expressed strong opposition to SSW's proposal to hire from a dovetailed seniority roster. He claimed this would violate traditional craft autonomy and would prevent the hiring of brakemen to fill Tucumcari Line road jobs. As a practical matter, SSW would hire few brakemen under the June 1980 proposal because many yardmen had earlier seniority dates than most brakemen. 30 Arnett 56-61; SSW Ex. 147, III; Pls. Exs. 86 & 111. SSW seemingly acceded to Crago's concerns a month later when it proposed an arrangement similar to the SSW seniority system: combine road and yard rosters but allow prior rights and preference rights within each craft. Pls. Ex. 10C (Cowan, SSW chief of labor relations, to Crago, May 18, 1981). Also, SSW would operate the Tucumcari Line as a separate seniority district. Id. Both changes in SSW's position would make it easier for brakemen to gain and retain brakemen's jobs on the Kansas City division.
From mid-1980 to mid-1981, the two labor factions, Rock Island/Kansas City Division employees and Pine Bluff Division employees, could not agree on the position they should take in the implementing agreement negotiations. Pls. Exs. 11B, 11C & 80; UTU Ex. 268A; 7 Swonger 48-51; 9 Huntington at 82-83; Huntington Depo. at 50, Crago Depo. at 120-21. The basic conflict was over how many Tucumcari Line jobs should go to former Rock Island trainmen, who should work diverted traffic and when SSW employees would fill the positions on the Tucumcari Line. 30 Arnett 86-87, Huntington Depo. at 56; Crago Depo. at 28-30, 31-33, 151-53; UTU 231A (Ekart, Herington local chairman, to Hardin, March 20, 1981, on discussions about diverted traffic).
In March 1981, Hardin responded to charges by the Herington local chairman that he favored SSW's Pine Bluff employees. UTU Ex. 232 at 1. Hardin stated he wanted a fair agreement for "both the former Rock Island and Milwaukee employees, and equally ... the employees of the existing Carrier." Id. He concluded: "I have every confidence that the parties can arrive at a completely fair and equitable agreement, mutually satisfactory and acceptable to all concerned, if they will simply approach the problem on a realistic basis and with full consideration of the rights of others." Id. at 3 (emphasis added).
The various labor representatives met at Cleveland on July 29 and 30, 1981 to settle their differences. Pls. Ex. 14; 28 Hardin 123-25. They reached agreement on their new bargaining position on July 30. 30 Arnett 103. Throughout these proceedings, the parties commonly called the new document the "Cleveland agreement." Pls. Ex. 13. The court will refer to the document as the "Cleveland proposal" because *1303 it represented labor's new bargaining position.
The Cleveland proposal had some similarities and differences to SSW's proposal. First, like SSW's proposal, all Rock Island employees already hired would receive prior rights. Id. at 2 & 3. However, the Union proposal made the current level of employment for roadmen prior rights positions, which Rock Island brakemen could fill until April 1, 1984. Thus if a Rock Island brakemen left a prior rights position before April 1, 1984, another Rock Island brakemen could take his place and gain prior rights status. Id. at 3, 1st ถ and 4, 3rd ถ. The number of prior rights positions was equal to the number of permanent positions SSW currently required to operate traffic. Pls. Ex. 53 (Crago to Hardin, December 24, 1982); 30 Arnett at 116. The number of positions agreed on for each terminal were: 43 at Dalhart, 39 at Pratt, 22 at Herington and 23 at Eldon. Pls. Ex. 13 at 2 (The treatment of prior rights positions at Eldon, where SSW operated no through trains, is explained in the next section.). The yardmen would receive prior rights at the location hired if employed before April 1984. Id. at 3.
Second, like SSW's proposal, the Cleveland proposal would merge road and yard crafts but not until after the preferential hiring provisions expired on April 1, 1984. Id. at 4, last ถ. Third, the Tucumcari Line would be a separate seniority district, id. at 1, 4th ถ; this is identical to the position SSW took in 1981. Pls. Ex. 10C. Fourth, unlike SSW's June 1980 proposal, Rock Island employees would receive full carryover seniority. Id. at 4, 1st ถ. The later two provisions would allow them to transfer to all points on the Kansas City Division.
SSW would hire Rock Island employees for additional positions attributable to the Tucumcari Line under the March 4 agreement. The Cleveland proposal is susceptible to two constructions on this issue. First, plaintiffs contend they received preference for all non-diverted jobs. Id. at 4, 2d ถ. This interpretation is supported by the testimony of the participants in the Cleveland negotiations, 30 Arnett at 94-96; Crago Depo. at 40-41, 154-55, 165-66, the UTU constitution provision on diverted traffic, Article 90, several earlier interpretations of the March 4 Committee, Pls. Exs. 6A at Q. 10 & 6B at Q. 4, and SSW's first proposal, Pls. Ex. 11 at ง 4(b).
A second construction is that jobs created after SSW received trackage rights would be divided between Rock Island employees and Pine Bluff Division employees based on their seniority on each line. Labor and management would not make an allocation of work based on an estimate of diverted traffic; employees from each group would bid against each other based on their Rock Island and SSW seniority. Crago Depo. at 156-57, 171-72; Pls. Ex. 13 at 4, 1st ถ (Rock Island employees have full carryover seniority); Pls. Ex. 14 (Crago to Tambaro, August 4, 1981, reporting on the Cleveland proposal); See Crago Depo. at 146-47, 149, 161-62, 167-68, 169-70 (explains the relationship between the implementing agreement and allocation of jobs after diversion).
The court studied the materials submitted on this issue at great length. The court finds little if any support for defendants' position that the Cleveland proposal allocates all post-diversion jobs to Pine Bluff employees. Instead, the court determines that Rock Island employees, under one of the two methods described above, would have received a great amount of the Tucumcari Line jobs after SSW opened the line to St. Louis. The Cleveland proposal on this point bears little resemblance to the comparable provisions agreed to in the February 23 implementing agreement.

4. Negotiations Concerning Eldon Brakemen
The Kansas City to St. Louis segment merits special attention. SSW did not operate through freight trains over this segment of the Tucumcari Line between 1980-82. Thus the court will develop in more detail the history of and negotiations relevant to the Missouri portion of the Tucumcari Line.
*1304 The Rock Island terminal between Kansas City and St. Louis was at Eldon, Missouri. 7 Miller at 7. The Tucumcari Line between Kansas City and St. Louis was in very poor condition after the late 1970's. 29 Hardin 75, Pls. Ex. 2, 363 ICC at 357. SSW tried to negotiate trackage rights for that segment of the Tucumcari Line while its application to purchase the entire Tucumcari Line was before the ICC. Pls. Ex. 2, 363 ICC at 357. If SSW had the western segment of the Tucumcari Line from Santa Rosa, New Mexico to Kansas City, it would need a connection to St. Louis. Huntington Depo. at 16, 22-25. SSW stated to the ICC it would withdraw its application to purchase the Tucumcari Line if it could not make the connection between Kansas City and St. Louis on trackage rights. The Line was considerably more profitable if it reached Saint Louis and rehabilitation of the Missouri portion was extremely expensive. Pls. Ex. 8C at VIII-11 at n. 6 (SSW's submission to the ICC in Dkt. 28,799 on March 24, 1980). The ICC sought to strengthen SSW's hand in those negotiations by granting SSW's application to purchase the entire segment. 363 ICC at 357.
All relevant entities were aware SSW would never use the Tucumcari Line between Kansas City and St. Louis: 1) the Commission: Pls. Ex. 2, 363 ICC at 357; 2) SSW: William Denton, vice president for SSW and SPT, Denton Depo at 6, 21, 24 (it was "ridiculous to rebuild" the Tucumcari Line; "the company was always considering other options to rebuilding that segment."); J.E. Hare, director of operations for SSW on the Kansas City Division, Hare Depo. at 7, 13 (SSW had no plans before or after ICC approval of the Tucumcari Line purchase to rebuild the Missouri portion of the Line.); 3) UTU: 29 Hardin 75 ("I knew they were going to try to get trackage rights somewhere."); 31 Arnett 23 (always aware of trackage rights bargaining).
As detailed, infra, section F. 2, the ICC granted SSW trackage rights over Missouri Pacific ("MP") track in October 1982. MP's track was south of and ran roughly parallel to the Tucumcari Line in Missouri. The terminal for the line was at Jefferson City, Missouri, about 30 miles south of Eldon. SSW Ex. 193 at App. A. Both labor factions recognized that trackage rights between Kansas City and St. Louis and the trains SSW ran over MP track were due to the purchase of the Tucumcari Line. 31 Arnett 45-46; SSW Ex. 53 (Swonger to Hardin letter, November 30, 1982); Pls. Ex. 39A (UTU arbitration submission) at 3 (two ICC proceedings "intertwined").
Huntington and Arnett promised Crago and Eldon local chairman Dick Miller on several occasions in 1980 and 1981 that Rock Island employees from Eldon ("Eldon men") would have prior rights to jobs between Kansas City and St. Louis on any trackage rights SSW obtained. Crago, in a letter to Hardin nearly a year before this litigation began, reported on the arrangements regarding trackage rights employment:
This concerns the use of Cotton Belt (another name for SSW) train service employees to mann [sic] trains between Kansas City and St. Louis via trackage rights over the MP.
On three occasions prior to Arnett being given permission to write an agreement with the Cotton Belt Management without Rock Island participation (the February 23 agreement), the question of who would mann [sic] the trains between Kansas City and St. Louis via trackage rights over some other railroad, was discussed in meetings with the railroad management. The question was raised by myself and both the carrier, and Arnett agree that the trains would be manned [sic] by hiring Rock Island trainmen from Eldon, Missouri. Local Chairman Miller was at two of these meetings. I intended this to be included in the implementing agreement.

Pls. Ex. 21 (January 3, 1983) (emphasis added); accord Crago Depo. at 47-48, 84-85.
Dick Miller, Eldon local chairman, had an understanding identical to Crago's of the relationship between trackage rights and the employment rights of the Eldon men. Miller attended a January 1981 negotiating session to insure that Eldon men would work trackage rights jobs. He left on the *1305 second day of meetings after receiving assurances from Huntington, Arnett and Crago that the Eldon men would receive employment on whatever line SSW received trackage rights. 8 Miller 12, 14, 47-49. The court finds Miller credible on this point; his failure to remember the exact words used at the negotiation sessions does not diminish the force of his actions or his understanding of an agreement. He drove to Texas to protect the members of his local and returned only after finishing this task. Miller's testimony is buttressed by two letters he wrote to Hardin. Miller believed until late 1982 that Eldon men would work trackage rights jobs. He was shocked to discover the implementing agreement written by Arnett and Huntington totally excluded Eldon men from employment on the MP trackage rights. Pls. Exs. 32G (November 26, 1982) & 32F (January 1, 1983).
The claims of Miller and Crago are buttressed by several other points. First, Swonger, who attended the same negotiating sessions on the implementing agreement, corroborated the recollections of Miller and Crago. 5 Swonger at 78-82; 7 Swonger at 124-25. Second, SSW filed in early 1981 an exhibit with the ICC explaining a hypothetical shift of forces from Eldon to Jefferson City. Pls. Exs. 73 at 1-2; 73A at 27, 71, 108; 73B at 156. While Arnett never saw this filing before trial, Dkt. no. 212, the ICC filing is probative of SSW's state of mind and makes it more likely than not that Huntington did express approval of jobs at Jefferson City for Eldon plaintiffs.
Huntington and Arnett testified that no agreement or understanding was ever reached between SSW and the labor representatives on Eldon men working trackage rights jobs. Dkt. no. 210, SSW Response Brief at 21-29. The court considered the cited testimony and finds it unpersuasive. The court's finding rests on the contemporary documentation supporting plaintiffs' testimony and the lack of credibility of defendants' witnesses. See section F. 4, infra.
The labor representatives always agreed on the jobs the Eldon men would fill. During negotiations at Cleveland, the leaders of both union factions agreed that the Eldon men should supply the manpower necessary to serve the number of trains on the line from New Mexico to Kansas City during 1981, if they had gone through to St. Louis. The 23 prior rights positions at Eldon reflects their best judgment of a level of employment comparable to that at the other three terminals. The labor representatives agreed the Eldon men should work 23 jobs when SSW connected the line from Kansas City to St. Louis regardless of how SSW reached St. Louis. 31 Arnett at 22-23, 30, 31, 35; Pls. Ex. 21 (Crago to Hardin letter, January 3, 1983).

5. Post Cleveland Proposal Negotiations
After formulation of the Cleveland proposal, SSW and UTU representatives set the first implementing agreement session for mid-October. Howard Kenyon, a UTU vice president and the newest member of the Rock Island negotiating team cancelled the meeting because of other commitments. Pls. Exs. 15, 15A & 15B. Huntington, SSW's chief negotiator, sent out the next notice on November 12, 1981, announcing a meeting on January 4, 1982. Pls. Ex. 15C. Huntington sent the November 12 announcement to the entire labor contingent, both Rock Island representatives (Crago, Tambaro, Kenyon and Allamprese) and SSW representatives (Arnett and Alford). Id. Huntington and Arnett cancelled the January 4, 1982 meeting with a December 23 mailgram. Pls. Ex. 15D. They stated: "Due to negotiations on other pressing matters including crew consist neither of us will be available to meet the week of January 4, 1982 as scheduled. As soon as the meeting can be rescheduled we will advise." Id. (emphasis added).
At some point in January but before January 18, 1982, Huntington and Arnett alone negotiated an implementing agreement. 9 Huntington 48-51; 30 Arnett at 104-05; Pls. Ex. 16. Arnett went to Cleveland to meet with Hardin about the tentative agreement. Arnett represented to *1306 Hardin that this implementing agreement was the same as the Cleveland proposal. The representation was misleading because the Arnett-Huntington agreement was substantially different than the Cleveland proposal. 5 Swonger at 90-92; 10 Huntington at 109-11; 28 Hardin at 125-28, 29 Hardin at 59-63; 30 Arnett at 106, 109-15; Crago Depo. at 41-46, 49, 58-59; Pls. Ex. 17. Hardin then approved the implementing agreement and authorized Arnett to sign it by himself. 28 Hardin at 125-27; 29 Hardin at 68-74; 30 Arnett 108-09.
The exclusion of the Rock Island representatives by SSW and UTU continued for a second month, throughout late January and February. Arnett failed to tell Crago about the true state of negotiation on two occasions. In January 1982, Crago called Arnett to determine when the parties could meet again to work on the implementing agreement. Pls. Ex. 17 (confidential report from Crago to Hardin, March 24, 1982, on the events of the first two months of 1982). Arnett stated he could not schedule a negotiating session at that time "because he was in a strike situation; and since Cotton Belt was not going through to St. Louis, his men could not get hurt." Id. Arnett did not mention he was negotiating or had negotiated an agreement with SSW and that he may have already discussed the agreement with Hardin. 30 Arnett at 103-07, 112-14.
In mid-February, Crago again called Arnett to schedule a negotiating session on the implementing agreement. Pls. Ex. 17. Arnett again did not disclose the true nature of the negotiations: an agreement concluded, approved by the UTU president and personal authorization to sign an agreement. Instead, Arnett tentatively agreed to schedule the next negotiating session for the second week of March. Id.; Crago Depo. at 41-46, 49; Huntington Depo. at 68-69.
In action a few days before signing the implementing agreement, defendants deceived another Rock Island employees' representative. On February 16, 1982, Allamprese wrote to the SSW labor relations department with a carbon copy to Arnett requesting notice of the next negotiating meeting. Pls. Ex. 18. The labor relations department in Tyler, Texas received the letter on February 19 and presumably Arnett did as well at his Tyler office. However, no member of the labor relations department or Arnett contacted Allamprese about the next meeting and imminent signing of an implementing agreement. 9 Huntington at 43-45; 31 Arnett at 18-19.
Four days later on February 23, 1982, Huntington and Arnett signed an implementing agreement (February 23 agreement). Huntington signed the agreement after Arnett informed him of Hardin's authorization to sign the agreement without Rock Island representation. 9 Huntington at 44-45; 30 Arnett at 108-09; Huntington Depo. at 68-69, 180-81.
By excluding all Rock Island representatives from the negotiating process in January and February 1982, Hardin and Arnett avoided all objections the Rock Island representatives would have made about the implementing agreement based on their rights under the March 4 agreement. In short, they considered Crago an "obstructionist" and did not want him to participate in the process. 28 Hardin at 125-27; 29 Hardin at 68-74; 30 Arnett at 107-09; 31 Arnett at 101-02, 107-08; Crago Depo. at 41-46. Hardin and Arnett also testified that the intentional exclusion of Rock Island representatives from the implementing agreement negotiations was proper under the UTU constitution. 29 Hardin at 69-73, 129-30; 30 Arnett at 107-08; 31 Arnett at 107-08. Both objections by the UTU officials are inadequate. Their assertions completely overlook 1) the contractual duty for dual representation in the March 4 agreement, 2) the year and a half practice of dual representation in the implementing agreement negotiations and 3) the differences between the excuses given in 1982 and the ones asserted now.

6. The Terms of the February 23 Agreement
The implementing agreement has important similarities and differences when compared to the Cleveland proposal. The number *1307 of prior rights positions and how the positions would operate were identical in each document. SSW would hire Rock Island employees in seniority order from the local roster and then in dovetailed order from the remaining rosters until April 1, 1984. The men holding a prior rights position on that date would hold them until death or dismissal for cause. Pls. Exs. 13 at 2-4 & 19 at งง 2-4.
Although the number of prior rights positions and bidding system at each terminal were identical in each document, the understanding on the provision for prior rights hiring at Eldon was not the same. Pls. Ex. 19 at ง 2(d). Huntington told Arnett prior to signing the implementing agreement that the Eldon men would not work positions on trackage rights obtained by SSW. 9 Huntington at 59-60; 31 Arnett at 74-77. The Eldon prior rights provision was of little value after Huntington's disclosure considering SSW moved no through trains on that segment of the Tucumcari Line and had no plans to rehabilitate it. 9 Huntington at 56-57; 22 Koenig 131-34; 23 Koenig 117-18; Huntington Depo. at 66-68; 71-72; 111-14. Arnett signed the implementing agreement without obtaining any beneficial provision for the Eldon men.
The provision on cross-craft hiring in the Cleveland proposal and the implementing agreement was identical. Under either, Rock Island employees did not have rights in the other craft until April 1, 1984. Pls. Exs. 13 at 4, 4th ถ and 19 at ง 1(d).
The February 23 agreement handled hiring for additional manpower in a radically different manner than the Cleveland proposal. Hiring for additional manpower requirements was an important topic in 1982 because of the expected increase in traffic over the Tucumcari Line after it opened to St. Louis. 7 Swonger at 113; 9 Huntington at 96-98; 23 Koenig at 60-61. Unlike the June 1980 and Cleveland proposals, Rock Island employees did not receive preferential hiring for additional positions.
The whole concept of seniority was also quite different. The implementing agreement had neither full carryover seniority nor separate seniority system provisions. Instead, the Kansas City Division was incorporated in the SSW seniority system. Those former Rock Island employees hired before the implementing agreement were given a system seniority date of March 24, 1980, with prior rights in their craft and district. Pls. Ex. 19 at ง 1(a). All hired at that time were dovetailed and placed at the bottom of the SSW roster. Id. at งง 1(b), 1(c). Any Rock Island employee hired after the prior rights positions received a system seniority date of the date hired and went on the SSW roster behind all the Pine Bluff Division employees and the prior rights Rock Island road and yardmen. Id. at ง 4(a).
SSW would hire for non-prior rights vacancies based on SSW seniority. The Rock Island brakemen without prior rights had not yet been hired by SSW. Therefore, they held no SSW seniority date. Without a SSW seniority date, they could not bid for a vacancy. All furloughed Pine Bluff Division employees had SSW seniority dates and could fill the Kansas City Division brakemen jobs as they opened. Thus under the February 23 agreement, SSW would not hire any Rock Island brakemen until all of its furloughed employees who wanted a position on the Kansas City Division had taken one. If all positions were not taken by furloughed Pine Bluff employees, SSW would hire Rock Island employees. Pls. Ex. 19 at งง 2 & 4 and side letter no. 2 at ถถ 1 & 2; 7 Swonger at 115-16; 9 Huntington at 70-75; 30 Arnett at 97-101.
SSW would continue to hire only Rock Island yardmen for yard jobs on the Tucumcari Line until April 1, 1984. After that date, Pine Bluff Division employees could exercise seniority for any additional yard positions. Pls. Ex. 19 at side letter no. 2, ถ 3. If a diversion of traffic from the Pine Bluff Division caused the increase in yard manpower requirements, SSW would hire Pine Bluff Division employees to do the work. Id. at ง 7. This diversion of traffic provision is identical to how UTU's constitution treats diverted traffic. Pls. Ex. 41 at Art. 90.
*1308 UTU claims Arnett traded away many of the provisions beneficial to the Rock Island brakemen, additional hiring after trackage rights, full carryover seniority, and separate seniority systems in return for the prior rights provisions. Huntington testified and Arnett corroborated that labor could only obtain the prior rights provisions at this heavy price. The two allege that labor could accept this deal or go to arbitration and get much less.
The court looks with extreme skepticism on this testimony. The two men effectively precluded all Rock Island representatives from participating in the negotiations and so can offer a very insulated version of the events. Second, unlike all other negotiations described in this litigation, they kept no records of their positions on provisions or of the various drafts exchanged during the negotiations to substantiate their version of events. Third, because of the motives attributable to each side described immediately below, the court finds their testimony that they could reach no other agreement difficult to accept.
Fourth, Arnett and Huntington testified about an agreement reached in late 1983 to bring Rock Island employees hired in July 1983 under the March 4 agreement. As detailed in section F. 4, infra, the court finds this testimony incredible. In light of these circumstances, the court is not persuaded by Arnett's and Huntington's testimony that the February 23 agreement was a "take it or leave it" situation.
Motives. SSW gained substantial monetary benefit from the future hiring provisions that capped hiring of Rock Island employees at the prior rights level. If SSW could use existing furloughed employees, it could save itself almost one salary per roadmen. For example, instead of paying a Rock Island employee to work a position on the Tucumcari Line and a Pine Bluff employee furlough or protective pay, SSW would employ the furloughed Pine Bluff employee on the Kansas City Division and pay one salary. 9 Huntington at 101-02; Huntington Depo. at 101-02, 153-55 (potential savings to SSW by this procedure of hundreds of thousands of dollars); Crago Depo. at 29-31; Pls. Ex. 21 (Crago to Hardin, January 3, 1983) (SSW will save hundreds of thousands of dollars under the February 23 agreement.).
SSW acknowledged the February 23 agreement gave it very favorable labor costs. In 1983 when labor attempted to renegotiate the implementing agreement, see, infra, section F. 3, SSW refused to alter the February 23 agreement because of the increased costs it would incur. Pls. Exs. 38 or 106 (Hardin to plaintiff Schesener, September 30, 1983, SSW refused to change the February 23 agreement because "changes would result in additional labor costs to it.") and 108 (Hardin to class representative Will, September 23, 1983, SSW would not alter the existing implementing agreement because "changes would cost them significant additional payments."); Crago Depo. at 73-74.
SSW also wanted to hire as few Rock Island employees as possible because of ongoing crew consist negotiations. A crew consist agreement allows an employee to sell his position to the railroad. The railroad reduces its permanent work force by one position forever and the ex-employee has a lump sum payment. See Pls. Ex. 75 (November 1988 SSW crew consist agreement). SPT reached a crew consist agreement with its employees west of El Paso in late 1983 or early in 1984. Koenig agreed with the obvious: "When you think you are close to a crew consist agreement, you don't want to hire new people because they will be protected people under the agreement." 23 Koenig at 62. SSW would have to spend more money in the long term if it increased its employee base.
Arnett's motivation for signing the agreement is equally apparent. He represented the Pine Bluff Division as its General Chairman. An agreement that allowed more furloughed Pine Bluff employees to work than Rock Island employees would benefit his constituents on the Pine Bluff Division. The Pine Bluff employee would have the choice of receiving unemployment or protective pay and staying at home or moving to the Tucumcari Line and receiving a regular salary. The court is aware *1309 Arnett is not currently a popular figure on the Pine Bluff Division. He lost the 1987 election for General Chairman; Pine Bluff employees excoriated him during an afternoon of testimony. 26 Shepherd, Raney, Braden, Beavers at 87-160. Nonetheless, the court finds the additional jobs for the Pine Bluff Division acted as a significant inducement in 1981-82 when Arnett cut the Rock Island representatives out of the implementing agreement negotiations.
The deceptive and conspiratorial conduct of defendants is best explained by an official of the Clerk's union on the Kansas City Division, Robert Nuss. Nuss gave credible testimony about a conversation he had with Huntington in July 1982. Nuss stated:
I met him and we just had a small conversation and come around to talking about the trainmen. I said, `You guys really have screwed the trainmen, haven't you?' Or to that effect, anyway. And he said, `No, we didn't.' And I said, `Now, come on, Bob. You know better than that. You wouldn't have given us clerks all these benefits if you didn't think we were right.' Then he come back with me and says, `Well, TCU [UTU] came to me with this offer.' He said, `I knew it wasn't right, but I says what the hell and we gave it to them.'
1 Nuss at 65-66. Nuss' testimony about the intent and scope of the implementing agreement comports with the court's conclusion after reviewing the terms and negotiating history of the February 23 implementing agreement.

F. AFTER THE IMPLEMENTING AGREEMENT

1. Reaction of Rock Island Representatives
Crago first learned of the February 23 agreement when he called Huntington a short time after its signing "to set up another session to negotiate." Crago Depo. at 43-44. Crago had no knowledge of a completed implementing agreement when he made the call. Id.; Huntington Depo. at 68. Crago's first response upon learning Huntington and Arnett had signed an agreement was that he "was assigned, and he had to make an agreement." Huntington Depo. at 68. Later in March, Crago set out his version of the events leading up to the implementing agreement. Pls. Ex. 17 (Crago to Hardin, March 24, 1982, confidential report). First, he recounted the deceptive conduct of Arnett in not informing him of the actual state of negotiations. Id. at 1. He then explained the effect the implementing agreement would have on the Rock Island employees:
As the agreement is set now, the Cotton Belt men are on the roster and they will now use Cotton Belt furloughed men for work on this line instead of continuing hiring former Rock Island men up to April 1, 1984, as the March 4 agreement intended.
Id. at 2; Crago Depo. at 47 (The implementing agreement "had the effect of shutting off any further employment of Rock Island people.")
Crago would not have signed the February 23 implementing agreement because of its treatment of future hiring and the Eldon terminal. 10 Huntington at 109, 125; 31 Arnett at 101-02; Crago Depo. at 46-47, 84-85.
Rock Island employees also quickly recognized the detrimental effect of the February 23 agreement. By late March 1982, plaintiff Jerry Volkman began an internal union appeal concerning the implementing agreement. His appeal, on behalf of all other Rock Island employees formerly on the Tucumcari Line, contested the February 23 agreement provisions on allocation of seniority and hiring when business increased. Pls. Ex. 31 at 2 (UTU Board of Appeals decision, quoting Volkman's March 24, 1982 appeal letter). Volkman collected three pages of signatures of other Rock Island employees who joined his appeal, including men from Eldon. 8 Blackburn at 110-11. At least ten Eldon roadmen contributed to Volkman's travel expenses when he appeared before the UTU Board of Appeals in January 1983. They realistically believed a successful appeal could result in a new implementing agreement with jobs assigned at Jefferson City. 5 Swonger at 92-93; 8 Miller at 27-29, 84; 8 *1310 Blackburn at 110-11, 115; 15 Volkman at 140-41.
On March 31, 1982, another Herington brakemen, plaintiff J. T. Kelso, filed an appeal regarding the hiring of Amarillo brakemen at Dalhart. Pls. Ex. 31 at 2-4.

2. Missouri Pacific Trackage Rights
On September 24, 1982, the ICC approved the Union Pacific-Missouri Pacific merger. A condition of the merger was a grant of trackage rights to SSW over the Missouri Pacific track between Kansas City and St. Louis. Pls. Ex. 4, 366 ICC 462, 584. The ICC approved SP's request for trackage rights to improve competition in the central U.S and second "to enable SP to avoid the expense of upgrading the recently obtained Rock Island line." Id. at 578. When granting these trackage rights, the ICC imposed the N & W-BN conditions pursuant to 49 U.S.C. ง 11347. The conditions were the labor protective provisions for the SSW employees adversely affected by the grant of trackage rights. 9 Huntington at 78-79; 23 Koenig at 29; 366 ICC at 621-22.
Two months later, Arnett and Huntington signed an interim agreement; it provided that prior to reaching a permanent agreement Pine Bluff Division employees would work the road jobs between Kansas City and St. Louis. Pls. Ex. 22 at ถ 1 (November 18, 1982); 8 Miller at 22-23; 9 Huntington at 81, 85-86; 31 Arnett at 44. On January 5, 1983, SSW began to operate over the Missouri Pacific (MP) track. 9 Huntington at 100. SSW located its terminal for the trackage rights at Jefferson City, Missouri. SSW utilized Pine Bluff Division employees at that terminal and at others along the Kansas City Division to work the increase in traffic after January 1983. Section F. 4, infra.
A week after operations began on the trackage rights, Huntington and Arnett began negotiations for an implementing agreement on the MP track. No Rock Island employee representative participated in the negotiation of the implementing agreement. 9 Huntington at 83. After several days of meetings, two principal issues remained for arbitration: 1) Do Pine Bluff employees have prior rights to all jobs between Kansas City and St. Louis? and 2) Does SSW have to hire former Rock Island employees to fill vacancies created by diverted traffic at the other terminals on the Kansas City division? 9 Huntington at 86-89; Pls. Exs. 26B at งง 1(a), 2(b) last sentence and 28A at ถถ 1 & 2.
The ensuing arbitration was largely academic. The court doubts a live controversy existed on section 1(a) between Arnett and Huntington. Huntington's notes of the last negotiating session shows agreement โrather than dispute โ on that point. Pls. Ex. 27 (Huntington's handwritten notes of January 14 negotiation session); 9 Huntington at 90-94.
Furthermore, Arnett's agreement to arbitrate the last draft of section 1(a) is particularly suspect because it totally benefits Pine Bluff employees. The first draft of ง 1(a) proposed by SSW allocated work based on the amount of traffic originating on the Pine Bluff Division. Pls. Ex. 26 at ง 1(a). By implication, the traffic not originating on the Corsicana Line should have gone to the Rock Island employees. Id. The provision Arnett and Huntington agreed to arbitrate had no language to support an argument that Rock Island employees should work any jobs between Kansas City and St. Louis. Pls. Ex. 26A at ง 1(a) & 26B at ง 1(b); 9 Huntington at 89-92; 31 Arnett at 56-57.
Arnett's perfunctory submission to the arbitrator on section 1(a) also evinces the non-adversarial nature of the arbitration. Pls. Ex. 29A at 2-3. The submission is merely descriptive and lacks any coherent argument. Arnett did not argue that jobs at Jefferson City were attributable to the Tucumcari Line based on the ICC's decisions in Dkts. 28,799 and 30,000, 31 Arnett at 62-64, 67-68; Pls. Ex. 73 at 4-6 (Peifer memo to other SSW labor officials, October 27, 1982, describing connection between ICC proceedings and advantages this gave to labor), or the parties' prior understanding that some of the jobs at Jefferson City were attributable to the Tucumcari Line and would go to the Eldon men.
*1311 The court has serious doubts any real controversy existed during the entire arbitration because SSW and UTU agreed all traffic traveling to or from St. Louis was diverted traffic. 9 Huntington at 99-100. With this general agreement on diversion, the answers to the arbitration questions were axiomatic. 10 Huntington at 18-19; 23 Koenig at 29-30, 34-35; 31 Arnett at 71-72. The second question was particularly nonsensical because the March 4 agreement did not purport to cover diverted traffic.
On March 9, 1983, the arbitrator adopted both paragraphs proposed by SSW. This decision granted Pine Bluff employees prior rights to all jobs created by traffic over the MP track between Kansas City and St. Louis. Second, the arbitrator removed former Rock Island employees from the March 4 agreement hiring provisions for work west of Kansas City on diverted traffic. Pls. Ex. 29B ("Warshaw decision" or "arbitration") at 6-7, 11; 9 Huntington at 98-99.

3. Volkman Appeal Decision and Subsequent Negotiations
On March 11, 1983, the UTU Board of Appeals ("Board") sustained the appeals of Volkman, contesting the impact of the February 23 agreement on Tucumcari Line hiring, and Kelso, attacking the hiring of Rock Island Amarillo brakemen at Dalhart. Pls. Ex. 31 at 16-19. The Board found the February 23 implementing agreement defective in three primary areas. First, UTU excluded Rock Island representatives from the implementing agreement negotiations. Id. at 16. Second, the agreement limited preferential hiring to the specified number of prior rights positions at each terminal. Id. at 17-18. Finally, the implementing agreement failed to provide job security for those hired after the prior rights positions by not granting them prior rights or carry over seniority. Id. at 17-18. The Board accepted the major premise of Kelso's appeal that Tucumcari Line Rock Island employees should have priority for hiring at all terminals on the Kansas City Division. Id. at 18-19.
A decision by the Board is "final and binding." Pls. Ex. 41, UTU constitution at Art. 27. The Board is the last avenue for appeal for a UTU member. Id.
Within a month after the Warshaw decision and the UTU Board of Appeals decision, various Eldon men wrote to Hardin complaining about the Warshaw award and wondering what would happen after Volkman's successful appeal. 8 Miller at 33-34; Pls. Exs. 32, 32D, 32E & 32H. They requested a remedy for the lack of jobs at Eldon through a new implementing agreement. Hardin responded by naming Crago and Arnett to negotiate a new implementing agreement. The Eldon men believed a new agreement would vitiate the effects of the Warshaw arbitration and the February 23 agreement. 8 Miller at 85, 90-92; 8 Blackburn at 115-17; Crago Depo. at 66-69; Pls. Exs. 32A, 32B, 32C, 32Q; UTU Exs. 240 & 240A to 240D. Their position was justified. In the first proposal to SSW after March 1983, labor wanted 23 jobs for Rock Island brakemen at Jefferson City. Pls. Exs. 34 & 33 at 4; 29 Hardin at 114-15.
UTU's May 1983 proposal remedied other defects from the February 23 agreement and the Warshaw decision. Both labor groups were represented in the negotiations. Regarding roadmen, the May 1983 proposal provided for operation of the Tucumcari Line as a separate seniority district, hiring from a dovetailed roster of Dalhart, Pratt, Herington and Eldon rosters, and prior rights for all Rock Island employees hired. Pls. Ex. 33 at งง 1 & 2. Yardmen also received prior rights when hired. Id. at ง 3(a). The proposal continued to keep the two crafts separate until April 1, 1984, when the consolidated road and yard rosters would be topped and bottomed. Id. at ง 3(b). SSW employees would work diverted traffic. Id. at 4.
The parties discussed the proposal at sessions in early May and July. Pls. Exs. 34 & 34A (Crago to Hardin on May 6 and July 12, 1982, reporting on negotiations). The parties reached an impasse on seniority allocation and practice in July. Pls. Ex. 34A. Crago asked Hardin to put pressure *1312 on SSW to end the impasse. Id. Shortly after Crago's request for assistance, Hardin talked with SSW but it would not changed its position. 29 Hardin at 108-10, 113-16. SSW did not want to alter the implementing agreement and low labor costs. Pls. Exs. 34A, 35, 38, 106, 108.
By early August, Crago considered further negotiations futile and stated he would do no further work on the matter unless Arnett filed a notice of a "major" dispute under the Railway Labor Act. Pls. Ex. 35. Arnett admitted he would probably not file a notice because he knew Pine Bluff Division employees would not vote to support a strike to back up the notice. 31 Arnett at 79. Arnett's threat to file a notice was hollow because UTU's membership was greater on the Pine Bluff than the Kansas City Division.
Hardin accepted Crago's resignation regarding the second implementing agreement in mid-September. Pls. Exs. 36, 108. Hardin informed several Rock Island employees who had closely followed the second set of negotiations in September 1983 that UTU could not negotiate a new implementing agreement. Pls. Exs. 38 & 38A. Plaintiffs filed suit in December 1983. Dkt. no. 1.

4. Tucumcari Line Employment in 1982-1984
During 1982, SSW's employment of brakemen on the Tucumcari Line was roughly equal to the prior rights numbers for Dalhart, Pratt and Herington listed in the July 1981 letter and the February 23 implementing agreement. SSW did hire 25 brakemen to fill some of the permanent positions in the spring of 1982. UTU Exs. 223A, 223B; SSW Ex. 155 (June 1982 work force report). This level of employment represented business attributable to the Tucumcari Line. Pls. Ex. 10D; 22 Koenig at 134-35. Prior to SSW opening the Kansas City to St. Louis segment, SSW could not divert any traffic from the Corsicana Line to the Tucumcari Line. 10 Huntington at 107-08; 27 Bosanko at 23.
After the ICC granted SSW trackage rights in September 1982, SSW began to prepare for an increase in traffic on the Tucumcari Line. Traffic would increase because 1) SSW would divert its existing St. Louis bound Corsicana Line traffic to the 400 mile shorter Kansas City Division ("diverted traffic") and 2) SSW would attract new business to the Kansas City Division because it could now reach St. Louis and points beyond with a 400 mile shorter route ("new business"). The general practice in the railroad industry is that if trains are diverted from one line to another, the workers on the original line follow their work on to the new line. Pls. Ex. 41, UTU const. at Art. 90.
SSW and UTU agreed to handle the allocation of diverted and non-diverted work differently for yardmen and brakemen. In 1983 and 1984, Arnett, Huntington, his successor, Koenig and Kansas City Division Superintendent Hare discussed whether Pine Bluff Division employees, under the article 90 diversion principle, should work some of the yard jobs at the Kansas City yard. 20 Koenig at 90; 30 Arnett at 62. SSW knew some amount of yard work was attributable to Corsicana Line traffic but could not determine the amount or percentage of yard work attributable to diverted Corsicana Line traffic. 20 Koenig at 90-91. SSW decided generally it would not make any division of work between Pine Bluff and Rock Island yardmen. Therefore, no Pine Bluff employee worked in the Kansas City yard before 1985. 20 Koenig at 90, 91. SSW tried to deviate from this policy on one occasion; it advertised two Kansas City yard jobs on the Pine Bluff Division. Arnett asked SSW for proof of an amount of diversion to substantiate an allocation of two yard jobs to Pine Bluff Division employees. SSW could not make the factual showing, backed down and withdrew the hiring bulletin. 30 Arnett at 63.
SSW treated Rock Island roadmen much differently than yardmen in 1983 and 1984. After SSW began to operate on MP track, Kansas City Division traffic and the number of brakemen jobs rose substantially. SSW had to hire an entire work force at Jefferson City to cover the Kansas City to *1313 St. Louis traffic. Pls. Exs. 23, 23A, 23B, 23C. Second, SSW needed to increase the number of road jobs at Herington, Pratt and Dalhart to handle the diverted and non-diverted St. Louis bound traffic. 7 Swonger at 116; 15 Volkman at 146; 16 Volkman at 5, 136-37; SSW Exs. 95-109 (monthly work force reports for January 1983 to April 1984 for the Kansas City Division); Pls. Ex. 78 (A three page summary of SSW Exs. 95-109 showing the employment on the Kansas City Division of Pine Bluff employees, prior rights Rock Island employees and non-prior rights Rock Island employees. Koenig, an SSW labor official, considered the summary very accurate. 20 Koenig at 92.)
Pursuant to the February 23 agreement provisions to hire based on SSW seniority, SSW filled the additional manpower requirements at the Kansas City Division terminals with furloughed Pine Bluff Division employees. SSW gave notice to all employees on November 26, 1983, that it would begin using the MP track after December 15, 1983. Pls. Ex. 23B. SSW estimated 71 trainmen on the Pine Bluff Division "could be affected as a result of operations over the Missouri Pacific Railroad." Id. On November 30, SSW solicited bids from Pine Bluff Division trainmen and yardmen for 109 jobs along the Kansas City Division: 36 at Jefferson City, 20 additional at Herington, 29 additional at Pratt and 24 additional at Dalhart. Pls. Ex. 23C (advertisement signed by J. E. Hare, K.D. Div.Supt.). The need for more manpower was no "surprise" to the SSW labor relations department. 20 Koenig at 60.
In January 1983, SSW employed 51 Pine Bluff Division employees at Jefferson City and 51 at the other three terminals. Pls. Ex. 78. In June, the Jefferson City employment level was nearly the same but the number of Pine Bluff employees at the other terminals rose to 95. Id. Meanwhile, the number of Rock Island employees working on the Kansas City Division remained stable at 109 โ the number of prior rights provisions at the three western terminals plus several employees at Eldon. Id. A few prior rights men from Herington or Eldon employed at Pratt or Dalhart would later use their 1980 SSW seniority date to take extra board jobs at their Rock Island terminals. They had the lowest seniority date, though, and were always subject to bumping by SSW men and returning to the point where they held prior rights. 15 Volkman at 136-37, 139; 16 Volkman at 8-9; 17 Wade at 95-97, 101-03.
In July 1983, SSW needed more roadmen. SSW had exhausted the number of Pine Bluff employees who wanted to transfer to the Kansas City Division. In an attempt to get more Pine Bluff employees to transfer to the Kansas City Division, SSW offered $10,000 to any employee who would relocate to the Kansas City Division. SSW FF ถ 255. SSW then began to hire from the Herington and Eldon rosters. When SSW informed Rock Island brakemen about the vacancies on the Kansas City Division, SSW told them:
they would not be under the March 4, 1980 agreement, they would not have credit for vacations, we were not sure how their seniority would be worked out โ at this time it would be the first day they showed up for work โ something else might be negotiated later. They were being hired [on] account of Diversion of Traffic.
We were hiring for Dalhart and Pratt.
We were also told that this was not their last chance โ if they turned us down and we were hiring again in the future, for Herington (most of them wanted to work Herington only) we would call again
SSW Ex. 164 (Reavis to Koenig, October 24, 1983) (emphasis in original); 8 Jones at 40-45, 86-87; 15 Donahue at 20-22, 24-25; 15 Spaulding at 74-75, 76-77; 19 Reavis at 10-13, 41-42, 55-57; SSW Exs. 160-63.
SSW made a strong, good faith effort to locate all unemployed Herington and Eldon brakemen and offer them a position in 1983. 19 Reavis at 37-38. SSW employed from 11 to 33 non-prior rights Rock Island employees from July 1983 to April 1984. Pls. Ex. 78 (employment figures equal total Rock Island hiring for the month less the prior rights number for that month). The only plaintiff who did not accept a position *1314 was Howard Howser. Howser wished to stay at Eldon and turned down positions at Dalhart (a prior rights job in 1982) and Liberal (July 1983). 17 Howser at 24-30. Howser did testify that he rejected the first job offer because he believed he could get a trackage rights job and the second because it was not under the March 4 agreement. Id. at 30-33. The court places little reliance on this testimony because Howser was led by his own counsel, was extremely fuzzy on when he talked to Miller and Reavis and has exhibited little interest in working on any railroad. Id. at 20, 27, 32-33.
SSW's manpower requirements exceeded the remaining unemployed Tucumcari Line brakemen who wanted to work or could be located. SSW hired eleven Rock Island brakemen from Nebraska in 1983. 19 Reavis at 38.
At trial, SSW and UTU officials, Arnett, Huntington and Koenig, claimed that at some later date, probably in late 1983, they agreed to bring the 30+ non-prior rights Tucumcari Line brakemen hired in July 1983 under the March 4 agreement. The July 1983 hires would then have vacation time computed based on their Rock Island seniority date and would have protective pay if they were furloughed. 10 Huntington at 121-23, 128-29; 23 Koenig at 50-52; 30 Arnett at 37-39; 75-78.
This trial testimony is completely undercut by other trial testimony and contemporaneous documentation on the status of the July 1983 hires. On two occasions in 1984, after this alleged agreement was made, SSW and labor officials disagreed about the status of the July 1983 hires. First in mid-February, Herington local chairman, K. Ekart, met with Koenig and Arnett. Pls. Ex. 89. Ekart reported after the meeting that "(t)he carrier has never conceded the people hired after July 1, 1983 were hired under the March 4, 1980 agreement." Id. Ekart was not aware of any change in SSW's position by April 1984. Pls. Exs. 89A & 89B.
Second, Arnett made a similar inquiry in May 1984. He stated:
The St. Louis Southwestern employed thirty-six (36) additional former Rock Island employees as trainmen in July-August, 1983. These individuals were hired to protect the service since the Carrier needed additional employees.
Of course, it is our firm position that these employees were hired pursuant to the March 4, 1980 Labor Protective Agreement and are entitled to all the benefits that are provided for under the agreement.
Please advise if it is your position that these employees were protected under [the] March 4, 1980 Agreement.
Pls. Ex. 110 (Arnett to Huntington, May 9, 1984). Koenig responded for SSW three months later:
It is the Carrier's position that these employees were hired as a result of the diversion of traffic over the Missouri Pacific between Kansas City and St. Louis as provided for by ICC Docket No. 30,000. These employees, therefore, were not hired pursuant to the March 4, 1980 Agreement which was the result of ICC Docket No. 28,799.
Pls. Ex. 109 (August 20, 1984).
The validity of the alleged agreement between Huntington, Arnett and Koenig to bring the July 1983 hires under the March 4 agreement is further undermined by their cumulative failure to inform any of the July 1983 hires of this beneficial agreement. Without any knowledge of the later agreement, the 30+ employees could not make claims for Article III protective pay or correct amounts of vacation. 10 Huntington at 122; 23 Koenig at 46-52, 137-38; 30 Arnett at 38-39.
The credibility of the three architects of the alleged late 1983 agreement is severely undermined by the above evidence. The court views their testimony on this point as something other than memory loss or confusion; it smells of willful deception to evince some benevolent intent by defendants to follow the March 4 agreement. The court therefore looks with great skepticism at the assertions of all three witnesses who participated in this scheme.
*1315 SSW has done little hiring since 1979. Besides the former Rock Island employees hired on the Kansas City Division, SSW has not hired any other brakemen or yardmen in the last ten years. 22 Koenig at 70-71. SSW will most likely not hire any more brakemen or yardmen. First, SSW has eliminated many yard jobs on the Kansas City Division. 13 Will at 106-09; 22 Koenig at 71. Second, SSW seeks to reduce road jobs under the November 1988 crew consist agreement. 23 Koenig at 4-5, Pls. Ex. 75.

5. Diversion
The issue of how much diverted traffic went over the Tucumcari Line in 1983 and 1984 occupied much trial time. SSW had two witnesses testify, both SPT employees: Kenneth Bosanko, Vols. 27 & 28 (traffic flow on SSW) and Calvin Lee, Vols. 23-25 (produced traffic flow study and criticized plaintiffs' expert's methodology). UTU used a statistician, Leonard Cupingood, to attack plaintiffs' expert, Vols. 25 & 26, and an SSW roadman from the Kansas City Division, Delmer Brown, to provide a diversion estimate, Vols. 31 & 32. Plaintiffs offered the testimony of a traffic diversion expert, Mark Hornung, Vols. 2-4, and a statistician, Prof. Terrell, Vol. 33. The parties extensively briefed the diversion question. Pls. Brief, Dkt. no. 204 at 118-192; Pls. Response, Dkt. no. 211 at 92-107; UTU FF at 96-116; SSW FF at 81-87, 118-32.
Diversion is the transfer of rail traffic from one line to another โ in this case from the Corsicana Line to the Tucumcari Line. 2 Hornung at 54; Crago Depo. at 16-17; Hare Depo at 22-24, 66-67.
The estimates of the amount of diverted traffic varied widely at trial. After trial, UTU and SSW advocated Brown's diversion estimate, apparently because it demonstrated the most diversion: 50% of the traffic between New Mexico and Kansas City was diverted and 100% of the traffic from Kansas City to St. Louis was diverted. SSW FF ถ 195; UTU FF ถ 251. SSW's traffic study by Bosanko showed 20-30% diversion on the Tucumcari to Kansas City segment and 100% on the line to St. Louis. SSW FF ถถ 289-92. Plaintiffs' study revealed approximately 10% diverted traffic on the Tucumcari Line in 1983 and 1984. Pls. Ex. 45.
SSW has taken many inconsistent positions on the amount of diverted traffic on the Tucumcari Line during the last ten years. First, SSW convinced the ICC it would divert traffic from the Corsicana Line to the Tucumcari Line. Pls. Ex. 2, 363 ICC at 343-46. Second when dealing with the yardmen in 1983-84, SSW could not quantify the amount of diverted traffic and did not allow any Pine Bluff Division yardmen to work on the Kansas City Division. Third, SSW told the Rock Island brakemen in 1983-84 that all traffic over the Tucumcari Line was diverted. See section F. 4, supra. Fourth, SSW told the Pine Bluff Division trainmen 71 employees could be affected by diversion in November 1982. Pls. Ex. 23B. Fifth, SSW certified 42 trainmen were furloughed because of the opening of the MP track. Pls. Ex. 39A at 5 (UTU's submission in the arbitration of the Pine Bluff Division employees claiming they were adversely affected by the diversion over the MP track ("O'Brien arbitration").).
Sixth, SSW argued in a 1984 arbitration that all other trainmen furloughed on the Pine Bluff Division were affected because of a decrease in business and greater efficiency on the Corsicana Line. 10 Huntington at 7-12; 22 Koenig at 58-62; Pls. Ex. 39 at 12-13, 21-22 (SSW's submission in the O'Brien arbitration). SSW won the O'Brien arbitration. Pls. Ex. 39B at 9-10; See also Pls. Ex. 40 (arbitration very similar in scope and result to O'Brien but involving enginemen). In its submission in the O'Brien arbitration, SSW stated that the diversion to the Kansas City Division from the Corsicana Line was 5% in 1983 and 4% in 1984. Pls. Ex. 39 at 13; 22 Koenig at 61-64 (author of Pls. Ex. 39 explains table on page 13). In accord with its actions on other issues, SSW was a chameleon on diversion of traffic.
UTU's position in the O'Brien arbitration was that at least 71 people on the Pine *1316 Bluff Division were affected by the opening of the Kansas City Division to St. Louis. Pls. Ex. 39A at 6.
Amidst these conflicting claims and calculations, the court finds several diversion estimates to have credibility. First, SSW's calculation in November 1982 that 71 trainmen on the Pine Bluff Division would be affected by the opening of the MP track. This estimate of the level of jobs altered by diversion is credible for several reasons. One, the estimate is close in time to the actual date of first diversion; it represents SSW's best contemporaneous guess of the labor impact of the MP trackage rights. Two, the estimate is not clouded by the impact of increased, non-diverted traffic on the Kansas City Division after it was open for a period of time.
Three, SSW made the prediction with its potential exposure for protective pay to Pine Bluff Division employees in mind. Under the N & W-BN conditions applicable in the O'Brien arbitration, the furloughed employee has to show a direct causal nexus between the transaction, the diversion over the MP track, and the adverse employment action against him. Pls. Ex. 39B at 8 (O'Brien arbitration decision); 22 Koenig at 108. UTU's premise in the O'Brien arbitration was that at a minimum 71 furloughed employees should receive protection based on SSW's prediction. While SSW kept the number of employees it had to pay protection to below its first public estimate, the 71 employee figure rather clearly represents a level of exposure to protective pay claims SSW thought it could manage. The court finds SSW's prediction of how many employees on the Pine Bluff Division would be directly affected by diversion very probative of how many Pine Bluff employees should follow the diverted traffic to the Kansas City Division. If one job was lost on the Pine Bluff Division due to diversion, the job should transfer to the Kansas City Diversion.
The second claim that has considerable merit is plaintiffs' study. Pls. Ex. 45. Hornung was the only diversion witness who made his living performing railroad traffic diversion studies. Government and private industry have made extensive use of his services. Hornung produced railroad traffic diversion studies for Congress on the potential sale of parts of the Conrail system, for the Rock Island Trustee concerning the sale of 20 to 30 different parts of the Rock Island, for CSX corporation and Conrail concerning the proposed sale of Conrail to the Norfolk Southern corporation and for the Kansas Department of Transportation and the Kansas Corporation Commission concerning the Union Pacific/Missouri Pacific/Western Pacific merger.
Many of the studies mentioned above were submitted to the ICC. Other studies were for railroads to use to determine if they should merge with another railroad, sell or purchase a line, or oppose a proposed merge in an ICC hearing. 2 Hornung at 42-46. Hornung's curriculum vitae, his extensive experience as a traffic diversion expert, his demeanor and responses as a witness were impressive to the court.
Defendants' experts on diversion had several credibility faults. Many were regular employees of a party (Bosanko, Lee and Brown). Lee and Cupingood attacked Hornung's study but had no background in railroads or diversion of traffic. 24 Lee at 40-41; 25 Cupingood at 143-44. While Bosanko, the compiler of SSW's study, did have considerable experience in the railroad industry, the study was designed more by SSW's counsel than the potential expert. 28 Bosanko at 30-31.
The court has reviewed in depth the detailed submissions on the diversion issue. The court will not burden this already lengthy opinion with a full explanation of Hornung's study. The court largely approves of Hornung's study. Plaintiffs adequately rebutted the key attacks on Hornung's study advanced by defendants at trial on the issues of the proper base year to use to compare traffic levels, the application of different formulas to the Tucumcari and Corsicana Lines to calculate diversion and the lack of a standard error in Hornung's study. Pls. Brief and Response at Dkt. nos. 204 at 118-192 & 211 at 92-109. *1317 The court finds the Hornung study the most reliable after the fact estimate of the amount of diversion of traffic from the Corsicana Line to the Tucumcari Line.

CONCLUSIONS OF LAW
Jurisdiction and venue are proper in this court. 28 U.S.C. งง 1331, 1391(b).

A. STATUTE OF LIMITATIONS ISSUES
Defendants challenged the timeliness of plaintiffs' hybrid duty of fair representation (DFR)/contract action in summary judgment motions. The court found plaintiffs' general claim of hiring violations of the March 4 agreement timely. The court found that Volkman's internal Union appeal of the February 23 agreement tolled the statute of limitations until March 1983. Plaintiffs justifiably relied on UTU's assurances that a second implementing agreement would rectify the errors in the first agreement. Therefore, the statute of limitations did not run from March to September 1983, while UTU tried to negotiate a second agreement with SSW. Plaintiffs' suit filed in December 1983 was timely. Dkt. no. 138 at 20-28.
The court reserved ruling pending further factual development on the DFR claim challenging the validity of the Warshaw arbitration. Id. at 28-30. The court was not clear if the second implementing agreement negotiations sought to resolve the problems created by the Warshaw award for the Rock Island brakemen. After a review of the responses written to Eldon men by Hardin, Pls. Exs. 32, 32A, 32B, 32C, 32E & 32H, the testimony of Eldon plaintiffs Miller and Blackburn and the UTU proposal submitted in May 1983, Pls. Exs. 33 at 4 & 34; 29 Hardin at 114-15, the court is convinced UTU attempted in the second implementing agreement negotiations to eliminate the violations of the March 4 agreement perpetrated by the February 23 agreement and perpetuated in the Warshaw arbitration. The Eldon men could reasonably rely on the promises of Hardin and Crago to work out the lack of jobs for Eldon plaintiffs. Plaintiffs need not have immediately filed a DFR claim based on Arnett's conduct in the Warshaw arbitration while their Union attempted to resolve this problem. See discussion in Dkt. no. 138 at 25-28 on law related to tolling the statute of limitations by union action.
UTU raised a new statute of limitations argument in its post-trial submission. UTU contends plaintiffs' first complaint in December 1983 did not encompass the DFR claim against the Warshaw arbitration. Dkt. no. 1. UTU notes that the first explicit mention of events leading to the Warshaw arbitration was in plaintiffs' second amended complaint in September 1984, Dkt. no. 40. Defendant contends the second amended complaint does not relate back under Fed.R.Civ.Pro. 15(c). The court cannot agree.
The filing of a class action suit tolls the running of the statute of limitations for all members of the putative class until a decision is rendered on class certification. If the court fails to certify the class, the statute begins to run again. Crown, Cork & Seal, Inc. v. Parker, 462 U.S. 345, 353-54, 103 S.Ct. 2392, 2397-98, 76 L.Ed.2d 628 (1983). The filing of a class action tolls the statute only for the persons in the purported class and on the claims asserted by the class representatives. See Id.
The initial complaint described the purported class as all former Rock Island employees "working on the Tucumcari Line, which runs from St. Louis, Missouri, to Tucumcari, New Mexico." Dkt. no. 1 at ถ 3. This class definition obviously includes all Rock Island employees at all terminals. The complaint then gives a bare factual outline of the case. Paragraph 15 lists the various ways the February 23 agreement violates the March 4 agreement, including: "Permitting furloughed SSW employees to take jobs ahead of former Rock Island employees on the Tucumcari Line;...." Id. at ถ 15(e). The first amended complaint uses the same class definition and refines without significant factual change the substantive claim covering SSW's hiring practices on the Tucumcari Line. Dkt. no. 21 at ถถ 3, 17(d). The second amended complaint adds the first explicit *1318 reference of the failure to hire Eldon men and the antecedents of the Warshaw arbitration. Dkt. no. 40 at ถถ 17(f), 18.
The timeliness of paragraphs 17(f) and 18 is governed by the relation back provision of Federal Rule of Civil Procedure 15(c). Rule 15(c) allows claims to relate back if "asserted in the amended pleading [that] arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." A plaintiff is within Rule 15(c) if he restates his original complaint with more particularity. 6 C. Wright, & A. Miller, Federal Practice and Procedure ง 1497 at 490-91 (1971). An amended complaint does not relate back, though, if the amendment describes a different transaction. 6 Federal Practice at 489-90.
The court concludes the two paragraphs in the second amended complaint are most aptly characterized as more specific allegations under the initial, general claim rather than new, unrelated conduct. The initial complaint dealt broadly with all violations of the March 4 agreement by the February 23 agreement along the entire Tucumcari Line. The implementing agreement failed to provide jobs for the Eldon plaintiffs attributable to the Tucumcari Line and governed by the March 4 agreement. Without adequate provisions in the implementing agreement to cover the Eldon terminal, Arnett and Huntington were able to rig the Warshaw arbitration. The second DFR breach was not possible without the first DFR breach. The initial allegation in Dkt. no. 1 encompassed the later specification in Dkt. no. 40.
After the enactment of the Federal Rules of Civil Procedure, pleading is no longer a formalistic game. Rule 15(c) is a prime example; it allows relation back if the actions described in the amended pleading "arose out of the conduct ... attempted to be set forth in the original pleading...." (emphasis added). The court concludes plaintiffs have met this burden and relation back is proper.
Other statute of limitations questions arose at trial. Plaintiffs made a contract/DFR claim for hiring in violation of the March 4 agreement for four or five positions at Dalhart in March 1980. SSW exhausted the Dalhart roster and then hired Rock Island brakemen from Amarillo. The court concurs that this onetime hiring practice violates the March 4 agreement. The court finds, however, that this claim is time barred.
The handful of Rock Island brakemen who were cut off from a Dalhart job in March 1980 by this illegal hiring (J.T. Kelso group) were immediately aware of the problem; they received notice they were hired on one day and had the notice withdrawn a day or two later. The Kelso group made informal inquiries and attacks on the Dalhart hiring at meetings in 1980-81 and in a letter to Hardin in 1981. Kelso filed a formal appeal to the UTU Board more than two years later on March 31, 1982. The Board rejected without discussion Arnett's assertion the claim was untimely and ruled in favor of Kelso. Pls. Ex. 31 at 10, 18-19.
The court determines the informal appeals of the Kelso group between March 24, 1980 and March 31, 1982 were insufficient to toll the statute of limitation. Unlike a formal appeal to the UTU Board of Appeals, the letter and oral questions of UTU officials by the Kelso group does not adequately put the Union on notice of the claim or demonstrate an election by the group to forego a judicial remedy over an internal union remedy. Instead, the Kelso group's conduct evidences inaction and an inability to properly assert a claim. Under the law and accompanying policy considerations enumerated in the court's earlier order on statute of limitations, Dkt. no. 138 at 20-30, the Kelso group did not toll the statute during the slightly more than two year period. Hence, under either the six month statute of limitations applicable to a DFR claim, DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), or the two year period applicable to the statutory cause of action, 49 U.S.C. งง 11347, 11705(b)(2), 11706(c)(1), the Kelso group's claim is not timely.
*1319 The court applies the same two standards to the transfer of eight furloughed SSW employees to Pratt in the summer of 1982. The DFR claim is not timely. The Pratt hiring incident was not taken up in the Volkman appeal or the second implementing agreement negotiations, the two events that tolled the statute for the general hiring claims under the March 4th agreement. Without any time tolled by pursuing union remedies, the December 1983 filing is nearly a year beyond the six month limitations period. The claim, though, is encompassed within the hiring violations perpetrated by the February 23 implementing agreement described in the first complaint filed in December 1983. Therefore, the claim is timely under the two year period applicable to claims under 49 U.S.C. ง 11347.

B. CLAIM UNDER 49 U.S.C. ง 11347
Both defendants mounted a second frontal assault after trial on plaintiffs' statutory claim for relief under 49 U.S.C. ง 11347. The court generally rejected defendants' similar challenges in its summary judgment order. Dkt. no. 138 at 30-33. The court will briefly discuss this claim again in relation to the new arguments raised by defendants.
Section 11347 and its predecessor, 49 U.S.C. ง 5(2)(f), have required the ICC for 50 years to provide conditions to protect railroad employees affected by a merger. The ICC can impose its own protective conditions or adopt an agreement reached by the parties to satisfy its mandate to approve a rail merger only if "the employees of the affected rail carrier will be in no worse position related to their employment as a result of the transaction during the four years following the effective date of the final action of the Commission...." 49 U.S.C. ง 11347.
For the first time, defendants assert the Commission did not adopt the March 4 agreement as the labor protective conditions for the Rock Island employees on the Tucumcari Line when it approved SSW's purchase of the Tucumcari Line. After a review of the relevant ICC order, examined in section C, FF, supra, the court finds that the ICC did adopt the March 4 agreement as the required labor protective conditions. Accord In re Milwaukee Railroad, 713 F.2d 274, 285 (7th Cir.1983 ("The March 4 agreement was reviewed and approved by both the ICC and the district court as a fair agreement."); see Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives' Assoc., ___ U.S. ___, 109 S.Ct. 2584, 2599, 105 L.Ed.2d 415 (1989) (Stevens, J., concurring and dissenting) (The ICC "routinely" provides protective conditions in sales, consolidations or abandonments.) Defendants' contention on the adoption of the ICC order has no merit.
Defendants raise again the claim that the substantive law does not support a ง 11347 cause of action: the statute does not protect jobs โ it can only provide monetary compensation. The court previously rejected this unduly narrow reading of the statute. Dkt. no. 138 at 32-33. The court reaffirms the earlier ruling. Norfolk and Western Railway Co. v. Nemitz, 404 U.S. 37, 44-45, 92 S.Ct. 185, 189-90, 30 L.Ed.2d 198 (1971) ("(T)he 1965 implementing agreement abrogated the standard of `compensation' covered by the preconsolidation agreement which had come under the protective order of the Commission." (footnotes omitted)); See Laturner v. Burlington Northern, Inc., 501 F.2d 593, 609 (9th Cir.1974) (compensatory protection under the statute can include jobs or other protection rather than monetary compensation); See Pls. Response, Dkt. no. 211 at 72-76. The compensation negotiated by the parties was the first right of hire provisions of the March 4 agreement โ not monthly protective payments. The ICC adopted this agreement and plaintiffs can sue SSW for a violation of the agreement and subsequent ICC order.
UTU, on the other hand, is not liable for a breach of the ICC order. Plaintiffs' specific jurisdictional basis for this action is 49 U.S.C. ง 11705(a). The statute allows a person injured by a railroad who does not comply with an ICC order to sue in district court. In the few instances when plaintiffs have invoked section 11347, the court ruled *1320 that only a railroad was the proper defendant or plaintiffs did not even sue the union. Modin v. New York Central Co., 650 F.2d 829, 832 (6th Cir.1981) ("Employees have a private right of action for damages against a railroad for violations of the employee arrangements imposed by the I.C.C. in connection with the approval of railroad mergers." (emphasis added)); Englehardt v. Consolidated Rail Corp., 594 F.Supp. 1157, 1164 (N.D.N.Y.1984) ("The Supreme Court has interpreted this language to provide an employee of a merging railroad with a private right of action for damages against his employer for violation of the ICC order pertaining to the merger."); Nemitz, 404 U.S. 37, 92 S.Ct. 185 (no union defendant); Atkinson v. Union Pacific Railroad Co., 628 F.Supp. 1117, 1119 (D.Kan.1985) (no union defendant).
The statutory cause of action is available solely against SSW. To determine if SSW breached the ICC order, the court must determine if SSW breached the March 4 agreement in the February 23 agreement. The court will turn next to that issue because it is also the starting point for evaluating plaintiffs' hybrid cause of action.

C. PLAINTIFFS' HYBRID CLAIM
Plaintiffs' basic claim is that 1) the February 23 agreement violates the hiring and seniority provisions of the March 4 agreement and 2) UTU violated its duty of fair representation ("DFR") to plaintiffs in negotiating the February 23 agreement and in the Warshaw arbitration. Plaintiffs' two pronged, hybrid cause of action is proper under the Railway Labor Act. International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 46-47, 99 S.Ct. 2121, 2124-25, 60 L.Ed.2d 698 (1979); Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 202-04, 65 S.Ct. 226, 232-33, 89 L.Ed. 173 (1944); Barnett v. United Airlines, 738 F.2d 358, 362 (10th Cir.1984), cert. denied, 469 U.S. 1087, 105 S.Ct. 594, 83 L.Ed.2d 703 (1984). The hybrid suit requires the court to find a breach of contract and a breach of the DFR. Barnett, 738 F.2d at 362; accord DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 164-65, 103 S.Ct. 2281, 2290-91, 76 L.Ed.2d 476 (1983); United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 62, 101 S.Ct. 1559, 1563-64, 67 L.Ed.2d 732 (1981) (both cases under analogous statutes). The court will first interpret the March 4 agreement, then determine if the February 23 agreement violates any significant provision of the March 4 agreement and finally examine UTU's conduct.

D. INTERPRETATION OF THE MARCH 4 AGREEMENT
Basic contract interpretation principles apply to the construction of labor agreements. The court must look at the contract as a whole and not unduly isolate one provision. Mastro Plastics Corp. v. N.L. R.B., 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956). The court's construction must give effect to the mutual intent of the parties. Loveless v. Eastern Airlines, 681 F.2d 1272, 1279 (11th Cir.1982). To determine the intent of ambiguous provisions, the court should consider "the bargaining history, the context in which the contract was negotiated, the interpretation of the contract by the parties, and the conduct of the parties bearing upon its meaning." International Brotherhood of Electrical Workers, Local 387 v. N.L.R.B., 788 F.2d 1412, 1414 (9th Cir.1986) (footnotes omitted). The court believes some of the terms of the March 4 agreement are ambiguous and illumination of their meaning is possible by examining the context of the negotiations and the subsequent conduct of the March 4 agreement signatories.

1. Representation of Rock Island Employees in Employment and Seniority Allocation Agreements
The first important issue is who must SSW deal with in employment and seniority matters in applying the March 4 agreement. The agreement sets out several procedures which require the purchasing carrier ("PC") to deal with a representative of the bankrupt carrier's employees ("BCE") and/or representatives from the purchasing carrier's employees. The PC must notify all employee representatives, *1321 including those of the bankrupt carrier, of its authority to operate or purchase a part of the Rock Island or Milwaukee lines. Art. I, ง 3. The PC must notify the representative of the BCE when it determines the additional manpower needed to operate the purchased line. Art. II, ง 2. After notification and discussion with the representative of the BCE, id., the PC must give formal notification to the BCE of how many additional employees it will hire. Art. II, ง 4. These provisions are unambiguous, and SSW generally followed them.
Regarding seniority allocation, an implementing agreement "will be reached on each purchasing carrier concerning the manner in which seniority will be allocated in filling additional job assignments, between the purchasing carrier's employees and the bankrupt carrier employees hired by the purchasing carrier. Art. II, ง 9(a) (emphasis added). The authorization provision is ambiguous; it is susceptible to the construction urged by plaintiffs of dual representation in implementing agreement negotiations. The agreement specifies two distinct groups with whom the PC must make an implementing agreement. The court might have labored in interpreting this provision if the actions of SSW and UTU had not been so unambiguous.
Within three weeks of signing the March 4 agreement, SSW requested and UTU named the representatives for the Rock Island and Pine Bluff groups in implementing agreement negotiations. SSW and all of the designated labor representative met on numerous occasions during the last half of 1980 and the first half of 1981 to discuss future hiring and seniority. When the labor representatives could not maintain a unified bargaining position, they all met in Cleveland in July 1981. The lone exception was the secret meeting in January 1982 when labor and management met without all labor representatives and quickly made a tentative implementing agreement. After the Volkman Board of Appeals decision found dual representation required by the March 4 agreement, UTU authorized two labor representatives for the negotiations between April and July 1983. The conduct of the parties to this litigation is powerful evidence that the March 4 agreement required dual labor representation.
The actions of other signatories to the March 4 agreement reinforces the interpretation that the March 4 agreement required dual representation when negotiating an implementing agreement. When SSW and Burlington Northern reached implementing agreements with other crafts, labor representatives of the PC and the BCE signed the agreements. When implementing agreements could not be reached by the labor representatives and the PC, the parties went to arbitration pursuant to Art. II, ง 9(b). Labor representatives from both sides participated in these arbitrations โ just as they had in the negotiations. Dual labor representation was not a gratuity thrown to BCE; SSW and BN recognized it in other contexts.
Finally, the court's interpretation of this provision is in accord with that of other bodies who have interpreted the March 4 agreement. When reviewing the pertinent language of ง 9(a) that this court quoted above, the Eighth Circuit held:
The third and correct construction would require the implementing agreements be reached with the active and significant participation of the representatives of the former Rock Island employees. Strong support for this construction is found in the March 4th Agreement's purpose, to protect the interests of former Rock Island employees, in the union's constitution, and in Tucumcari [the UTU Board of Appeals decision on the Volkman appeal], which, in delineating internal UTU policy, declared that all employee representatives should participate in the negotiation of implementing agreements.
Beardsly v. Chicago & North Western Transp. Co., 850 F.2d 1255, 1269 (8th Cir. 1988) (emphasis in original), cert. denied, ___ U.S. ___, 109 S.Ct. 1340, 1341, 103 L.Ed.2d 810 (1989).
UTU's arguments are not persuasive. UTU correctly asserts that it does not represent anyone not in its bargaining unit, *1322 i.e., those Rock Island employees not hired at the time of implementing agreement negotiations. Schneider Moving & Storage Co. v. Prosser's Moving and Storage Co., 466 U.S. 364, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984). UTU fails to acknowledge that it 1) had a duty to those Rock Island employees already hired who became part of its bargaining unit and 2) took on a contractual duty with SSW in the March 4 agreement to have representatives of the Rock Island and Pine Bluff Division employees present in negotiations on an implementing agreement. The contractual duty can supplant UTU's typical statutory representation duty. Schneider Moving, 466 U.S. at 376 n. 22, 104 S.Ct. at 1851 n. 22.
UTU's claim that its constitution allowed the general chairman to act alone in the implementing agreement negotiations is quite lame. UTU ignores the contract provisions detailed above and its general practice in this case and many others to scrupulously honor the dual labor representation requirement. The court finds the most probative evidence of the invalidity of this assertion in Arnett's failure to give Rock Island employees the "Union constitution" excuse in 1981-82 when he claimed he could not negotiate but actually met with Huntington and secretly concluded an agreement.

2. Hiring of Rock Island Employees
The court will quickly review the provisions of Article II of the March 4 agreement applicable to hiring Rock Island employees. All Rock Island employees who held seniority in a craft on March 4, 1980 could participate in the preferential hiring provisions described in งง 2-7. ง 1. The PC determines the additional manpower required by its purchase. ง 2. The PC "shall" fill the openings created by the purchase by allowing "eligible employees in seniority order on the Rock Island ... the first right of hire...." ง 3. In fulfilling the first right of hire provision, the PC "shall first utilize existing seniority rosters applicable to the appropriate craft and seniority district for the lines and territories involved in fulfilling employment needs in connection therewith." Id. "The applicant's seniority in the appropriate craft and seniority district on the bankrupt carrier will prevail if the number of qualified applicants exceeds the carrier's determined need for additional employees." ง 4. The PC cannot use its furloughed employees to fill its additional manpower requirements "until after bankrupt carrier employees on appropriate rosters have exhausted their opportunity to be hired hereunder." ง 2.
The numerous references in sections 2-4 to "appropriate" "craft" or "roster" alert even the bleary eyed to the locus of controversy. The extent of SSW's obligation to hire Rock Island employees before it reassigns its furloughed employees to the Kansas City Division is determined by the scope of those terms. Plaintiffs take an expansive view of the pertinent terminology. They argue ง 1 creates a pool of all Rock Island employees in all crafts and districts. The restrictive language of appropriate craft or appropriate seniority district is more prescriptive than proscriptive; the terminology prioritizes the huge pool of employees identified in ง 1 but proscribes no employee from eligibility for any position. The hiring scheme SSW should have followed under plaintiffs' interpretation for a Tucumcari Line brakeman's opening at Dalhart is to hire first from the craft roster at Dalhart, second, from a dovetailed roster of all the unemployed brakemen on the Tucumcari Line and third, from a dovetailed roster of the unemployed yardmen on the Tucumcari Line. Pls. Brief at 8-19 & 34-38, Dkt. no. 204.
Defendants urge a narrow reading of sections two-four: For a Dalhart brakeman's position, SSW had to hire solely in seniority order from the Dalhart brakemen's roster. If SSW had hired everyone on the Dalhart roster, it could transfer furloughed employees to fill the Dalhart opening.
The court finds that the language of the March 4 agreement and the parties' post-agreement conduct wholly supports neither interpretation. The court determines that for a Dalhart brakeman's opening, SSW had to hire from the Dalhart *1323 roster and then from a dovetailed roster of the unemployed brakemen from the other three terminals on the Tucumcari Line.
First, the court will explain why defendants' construction is too restrictive. The references in sections 3 and 4 to the PC's obligation to "first" hire from the appropriate craft and seniority roster and the reference in section 2 for the PC to not recall its furloughed employees until the BCE "on appropriate seniority rosters have exhausted their opportunity to be hired hereunder" make plain the PC's duty to hire from multiple rosters. The drafters of the March 4 agreement would not have needed to use the word "first" twice if they contemplated limiting the PC's hiring obligation to one roster. The choice of the word "first" evinces a need to prioritize seniority rosters. The reference in section two to "rosters," plural, reinforces the court's conclusion that the PC had to hire from more than one roster.
The crucial interpretative question is what other rosters must the PC use to fulfill the preferential hiring provisions. Article II is not clear on this point. The conjunctive references in sections 3 and 4 to "appropriate craft and district" evidence considerable intent to hire solely within a craft. The rosters from the other seniority districts on a line and within a particular craft would meet both parameters created by the contract language โ same craft and multiple rosters. SSW followed this general interpretation in its dealing with Rock Island brakeman and with other crafts on the Tucumcari Line with multiple seniority districts. The court finds SSW's contemporary interpretation of this issue very illuminating.
SSW hired temporary brakemen to do rehabilitation work from the roster where the employees were needed and then from the remaining rosters on the line โ if necessary. SSW used the same procedure when it needed brakemen for permanent positions on the Tucumcari Line to work through freight trains. In the February 23 implementing agreement, SSW contracted for an identical arrangement to fill prior rights positions until April 1, 1984. In the implementing agreements SSW reached with other crafts with multiple seniority districts on the Tucumcari Line, SSW followed the same practice. On every occasion in 1980-82, SSW did not interpret the preferential hiring language in the manner it advocates today.
SSW's arguments for a restrictive reading of the hiring provisions are neither consistent nor cogent. Egbers, SSW's chief witness, stated that the railroads' position at the March 4 negotiations was to hire as few BCE as possible in order to use as many of their own furloughed employees. The railroads allegedly fought every provision that would have required them to hire additional BCE; the "appropriate roster" is thus the one at the location where the additional manpower is needed.
SSW's conduct in 1980 through 1982 totally belies Egbers' interpretation. SSW had many chances to apply the March 4 agreement using their current interpretation. They quickly exhausted the rosters at Pratt and Dalhart in 1980 but they did not attempt to transfer furloughed employees into the positions created by Tucumcari Line traffic in 1980 to 1982. SSW's claims that it acted benignly or with beneficence in hiring Herington and Eldon Rock Island employees for the additional positions at Dalhart and Pratt are not credible in light of the adversarial and arms length negotiation of the March 4 agreement and the implementing agreement. SSW put on no evidence of a practice in 1980-82 to give benefits to BCE.
Plaintiffs' expansive reading of the first right of hire sections has no firmer foundation in the language of the March 4 agreement or their contemporaneous conduct than did defendants' construction. Plaintiffs' contention is premised on the definition of "eligible employees" in section one and its insertion in toto in section three. The court has no quarrel with the catch all definition of eligible employee in section one propounded by plaintiffs. The drafters needed to cast the general eligibility net as wide as possible to provide potential employment for a large number of Rock Island employees.
*1324 Plaintiffs cannot, though, automatically transplant the broad "employee" term of section 1 to section 3 and mandate the hiring of yardmen after brakemen. The later section begins: "As a carrier determines its need for additional employees under this Article, it shall allow eligible employees in seniority order on the Rock Island ... the first right of hire...." (emphasis added). The "employee" terminology is modified by the requirement to hire in "seniority order." Seniority order is defined in the last sentence of section three as those "existing seniority rosters applicable to the appropriate craft and seniority district...." With "eligible employees" modified by the ambiguous phrase "appropriate craft and district," the court returns to the same interpretive quandary. The court will again review the contemporaneous actions of the parties to clear the muddied interpretative waters concerning the proper place of yardmen in hiring for brakeman jobs.
Plaintiffs have offered little evidence to support their claim that yardmen are eligible under the March 4 agreement for brakemen jobs. Plaintiffs note the similarity of the work each craft performs and how the two crafts merged on many railroads in the 1960's and early 1970's. Both points are valid but offset by the failure of Rock Island roadmen and yardmen to combine crafts in 1971 and the lingering veneration of craft autonomy exhibited by Rock Island employees of both crafts. As discussed below, Rock Island employees in 1980-82 wanted to keep crafts separate and steadfastly refused to bargain for the employment scheme they now request.
Plaintiffs next cite SSW work rules that allow yardmen and roadmen to work jobs in the other craft; plaintiffs come under SSW work rules once hired by SSW. Art. II, ง 8(b). Hence, they contend SSW should hire from both crafts for brakemen positions. Plaintiffs' comparison is not apt. Plaintiffs cannot utilize the SSW system until they are hired by SSW; prior to that time, Rock Island employees maintain seniority under the Rock Island system. Art. II, ง 7. The March 4 agreement concerns the use of existing Rock Island and Milwaukee seniority rosters for hiring by any PCs. SSW work rules are not probative of the scope of a hiring agreement based on the bankrupt carriers' seniority systems.
Next, plaintiffs cite a question and answer from the March 4 Committee on how a carrier, who does not operate separate yard and road work, should hire yardmen to perform some portion of general "road" work. Pls. Brief at 37, Dkt. no. 204. The Committee advised the railroad to hire yardmen to do the road work based on a grant to the yardmen of a Rock Island road seniority date of 1972. Plaintiffs' comparison is again not germane because SSW at all times hired yardmen for yard jobs. Unlike the situation before the March 4 Committee, SSW roadmen never performed yard work.
Finally, plaintiffs note in passing that SSW hired several yardmen for road service for a short period of time to do rehabilitation work. Pls. Brief at 17. The court views this limited hiring as an isolated incident. The court does not find this small amount of cross craft hiring to do temporary work persuasive of the parties' understanding of the March 4 agreement. On all other occasions, SSW hired brakemen from the Tucumcari Line for brakemen positions; plaintiffs agreed with SSW on this practice.
At all times throughout the negotiation of the implementing agreement on the Kansas City Division from 1980-1983, Rock Island employees vigorously worked against allowing yardmen to bid for roadmen positions. First, Rock Island employees rejected SSW's June 1980 proposal because SSW would have done all future hiring from a dovetailed road and yard roster. Roadmen thought cross craft hiring violated the March 4 agreement because it reduced the number of roadmen hired under the March 4 agreement and because it would violate traditional craft autonomy. Second, when all labor representatives met in Cleveland in July 1981, they agreed yardmen were not eligible for road positions until after the end of the preferential hiring provisions on April 1, 1984. Third, Arnett and Huntington included this part of the Cleveland proposal in the implementing *1325 agreement. However, Volkman did not challenge its validity in his appeal. Fourth, in May 1983, after the UTU Board of Appeals disapproved of much of the implementing agreement, labor's proposal again included the provision to merge crafts but not to allow cross craft hiring until after the March 4 agreement expired.
In sum, plaintiffs' assertion that yardmen should be included in the preferential hiring for road jobs is a speculative claim not supported by significant evidence. The vast majority of evidence of both sides conduct in the two years immediately after the inception of hiring under the March 4 agreement is that the preferential hiring clauses applied to the craft and line purchased by a railroad. The court determines this contemporaneous evidence is conclusive of the correct interpretation of the appropriate craft and roster language in sections 2-4 of Article II.

3. Length and Scope of Preferential Hiring Provisions
The next important issue is how long a PC had to extend the first right of hire to BCE instead of using its own furloughed employees. The agreement states: Article II "shall continue in full force and effect for not less than one year from the effective date from the commencement of operations or as otherwise provided for by law, but in no event beyond April 1, 1984." ง 5. Defendants assert the hiring provisions ended after one year unless expressly agreed to by the PC and the employees. Egbers and Hardin testified that the "or as otherwise provided for by law" phrase refers to the remedial Milwaukee and Rock Island Acts. 45 U.S.C. งง 901-922 & 1001-18. The court accepts this logical inference from the language of the section and the circumstances of the negotiations. The "or as otherwise" language also refers to the durational provision of 49 U.S.C. ง 11347, see p. 92, supra, which mandates four years of protection for workers covered by an ICC protective order. The court finds the implicit reference to this latter statute particularly persuasive of the scope of the durational provision.
The two officials further testified that after one year the March 4 agreement ended and the only protection for BCE was in the two Acts. The court cannot accept such interpretation. The contract provision establishes a minimum and maximum length for the hiring provisions but seemingly does not order any automatic cessation of the provisions in the manner urged by defendants. If the drafters of the March 4 agreement wanted it to end after one year and have the legislation take over for the next three years, the "or as otherwise" phrase was certainly an obscure way to dictate their wishes. The disjunctive "or" demonstrates to the court a willingness to have both employment opportunity provisions for BCE run concurrently. The court again will rely on the parties' actions in the months immediately after the signing of the agreement to confirm its apprehension of the proper construction of the duration provision.
Defendants' "only one year" construction of section five is undercut by their conduct in 1980-82. Three times within a year of signing the March 4 agreement, SSW stated the preferential hiring provisions continued until April 1984: the first implementing agreement proposal to plaintiffs in June 1980, the implementing agreement with the engineers union in December 1980 and in Peifer's memo summarizing the implementing agreements with all the crafts on the Tucumcari Line. Pls. Exs. 11, 88 at ง 7 & 11D at 4; Huntington Depo. at 41-42. When all of the appropriate labor representatives met in Cleveland in July 1981, they agreed the hiring provisions should extend until April 1984. Pls. Ex. 13 at 3-5. The February 23 agreement made by defendants ended the preferential hiring provisions at April 1984. The unmistakable conclusion is that defendants always interpreted section five to last for a four year term prior to the filing of this litigation. The court finds this understanding of the parties in 1980-82 the most plausible interpretation of section five.
The concomitant principle to the four year duration of the hiring provisions is that SSW had to preferentially hire Rock Island employees for all jobs attributable *1326 to the Tucumcari Line during the four year period. The court draws this interpretation from several sources. First, the applicable contract language. The PC must hire in seniority order for the "additional manpower requirements resulting from a transaction, ...." ง 2 (emphasis added). The PC shall hire from the appropriate rosters "for the lines and territories involved in fulfilling employment needs in connection therewith." ง 3 (emphasis added). The court finds this language supports an interpretation requiring the PC to use BCE for all positions created by the new line, excluding diverted traffic. This interpretation conforms to the general purpose of the agreement to hire Rock Island employees. Second, the March 4 Committee gave an identical response to two questions within the first year of the agreement. Pls. Exs. 6A at Q. 10 & 6B at Q. 4. SSW's evidence does not vitiate the court's interpretation SSW had to hire for positions created throughout the four year period.
Egbers testified that railroads could not have intended to determine how many employees it would need and then add to its work force later or accurately predict how many additional employees the purchased property might require in subsequent years. This assertion has some force because of the speculative nature of the level of traffic in future years. The PC, however, did not have to identify its future needs with exactitude and could, as SSW did on the Tucumcari Line in 1980-82, adjust its employment levels upward as business increased over time after consultation with labor representatives.
Furthermore, Egbers' employer, BN, proposed in an arbitration on a purchased section of the Milwaukee two different methods to allocate additional jobs attributable to the purchased line for BCE after operations began. UTU 214C at 14. When confronted with this evidence, Egbers stated BN was generous in that arbitration because Milwaukee employees had a nice general chairman. The court finds this rationale incredible. The much more likely explanation is that BN understood the March 4 agreement required it to make those calculations.
A final question remains on the general scope of the preferential hiring provisions regarding the extent of the transaction covered by the March 4 agreement. The preferential hiring provisions apply to "additional manpower requirements resulting from a transaction" and to filling "employment needs in connection with" the acquisition of a line. Art. II, งง 2 & 3 (emphasis added). The ICC adopted the March 4 agreement to cover SSW's purchase of the Tucumcari Line. Defendants argue the March 4 agreement has no application to the jobs on the trackage rights between Kansas City and St. Louis because the ICC granted SSW rights over those tracks in another proceeding in which the March 4 agreement played no part. While this contention has some technical and facial appeal, the court holds the trackage rights grant was completely dependent on the purchase of the Tucumcari Line. Therefore, the additional manpower requirements of non-diverted traffic on the Kansas City to St. Louis segment were a result of the initial purchase of the Tucumcari Line. Any increase in employment because of non-diverted traffic on the rest of the line was also attributable to the original purchase of the Tucumcari Line.
In 1980 when the Commission approved SSW's purchase of the Tucumcari Line, it made several critical findings. First, the ICC explained in economic terms why it was so important for the financial health of ailing SSW to reach the crucial St. Louis gateway. St. Louis is an important terminus because it is a prime location for a western railroad like SSW to interchange with eastern shippers. Second, for SSW to improve its business, it needed to reach St. Louis via the Tucumcari Line. The Commission thought the Tucumcari Line was crucial because it was 400 miles shorter than the Corsicana Line, thereby a more attractive route in general. The purchase of the Tucumcari Line also gave SSW a competitive route in the central United States, which it did not have and needed in order to be profitable. Third, in order to reach St. Louis via the Tucumcari, the ICC allowed SSW to purchase all of the Line, *1327 even though the Kansas City to St. Louis portion was inoperable. The ICC allowed SSW to purchase this nonessential part of the nation's railway system so it could successfully bargain for a cheaper route to St. Louis over some other railroad's track. See discussion at pp. 1291-92, supra, explaining and quoting from the relevant ICC decisions.
Throughout 1980-82, SSW believed it would receive trackage rights to reach St. Louis. SSW made no plans to rehabilitate the Kansas City to St. Louis segment of the Tucumcari Line. SSW and labor officials agreed Rock Island employees would work trackage rights jobs. SSW submitted a proposed transfer of the Eldon, Rock Island terminal to Jefferson City on the MP track to the ICC.
A little over two years after SSW received permission to purchase the Tucumcari Line, the ICC granted SSW trackage rights over the MP. The Commission's purpose was to 1) use the Tucumcari Line to promote competition in the central United States and 2) "enable SP [SSW's parent] to avoid the expense of upgrading the recently obtained Rock Island line." Union Pacific/Missouri Pacific Merger, 366 ICC 462, 578 (1982), Pls. Ex. 4. The court concludes after examining the positions taken by SSW and the ICC in 1980-1982 that the Missouri Pacific trackage rights would not have been possible without the purchase of the Tucumcari Line from Kansas City to St. Louis. The ICC allowed SSW to "rehabilitate" the Tucumcari Line by substituting trackage rights for the most decrepit section of the Tucumcari Line. The court finds that to allow SSW to avoid its obligation to hire Rock Island employees by this substitution of trackage rights would violate the provisions of the March 4 agreement to hire Rock Island employees from the appropriate rosters on the line. Therefore, the court rules the additional manpower requirements for non-diverted traffic at Jefferson City on the MP track and the other terminals created after the opening of the trackage rights resulted from the purchase of the Tucumcari Line.

4. Seniority
The March 4 agreement does not dictate the allocation of seniority between the PC's employees and the BCE; it gives the task to the parties. The agreement states: "In accordance with the option selected under paragraph 8 of this Article, agreements will be reached on each purchasing carrier concerning the manner in which seniority will be allocated in filling additional job assignments,...." Art. II, ง 9(a). The options alluded to in paragraph 8 were to either 1) expand an existing seniority district and commingle the work from the existing and purchased lines or 2) operate the acquired property as a separate seniority district. Id. at ง 8(c)(1), (2).
Plaintiffs argue they had to receive some sort of beneficial seniority protection in the implementing agreement, carry over seniority or prior rights for example, to insure that once they were hired preferentially Pine Bluff Division employees would not immediately displace them. Pls. Brief at 27-34. Beyond a mere desire for enhanced SSW seniority, plaintiffs' most cogent assertion is that the two seniority system options of section 8(c) require this conclusion. Plaintiffs contend they would receive adequate seniority protection if SSW used the separate seniority district option; they should not receive worse treatment if SSW chose to extend an existing district and commingle the work from the two lines. ง 8(c)(1), (2). While this claim creates symmetry, plaintiffs cannot point to any language in the agreement which compels an idyllic balance. The court's review of the testimony and documents of the March 4 agreement negotiations, implementing agreements on other purchased lines and the implementing agreement negotiations with SSW reveals no guarantee of any type of seniority to any group of BCE.
Instead, the March 4 agreement provides employment security to the BCE through its guarantee of protective pay to the BCE hired by a PC and then furloughed. Art. III. In 1980 or 1981 when many PCs made seniority allocation agreements, PCs could either agree on some security protection for BCE they hired or face the prospect of *1328 hiring them, have furloughed employees displace them and then make payments to members of both groups for three years. BCE could use this scenario to argue they should receive seniority that would protect them from an immediate lay off once hired. Plaintiffs' argument, while potentially persuasive at the bargaining table, is not sufficiently grounded in the March 4 agreement to persuade the court. The Article III protective payments are the only mandatory employment security found in the March 4 agreement.
Plaintiffs' apparent impetus for carryover seniority is to make it easier for those with prior rights at terminals different than their original Rock Island terminal to return to those points. With full carryover seniority, Rock Island employees could compete for jobs based on their number of years working on the Rock Island rather than their number of years working on the SSW. Much of the testimony given by class representatives was about the emotional and financial rigors of taking a job in a location away from their home town. The court recognizes the inherent costs in relocating for a new job, however, plaintiffs are mistaken in their conviction that full carryover seniority or working in your home town are natural rights. These rights are not pulled out of thin air; they must stem from a generally recognized point of law or from contractual rights. Plaintiffs point to no source that provides them with full carryover seniority or rights to permanently work in a particular location. The lack of carryover seniority in any implementing agreement is not a violation of the March 4 agreement.

E. VIOLATIONS OF THE MARCH 4 AGREEMENT BY THE FEBRUARY 23 AGREEMENT
The primary way the implementing agreement violated the March 4 agreement was its preclusion of any future hiring of Rock Island brakemen until after SSW transferred all willing Pine Bluff Division furloughed employees to the Kansas City Division. Pls.Ex. 19 at ง 4 and side letter no. 2; see FF, ง E. 6, supra. Section four and the accompanying side letter require SSW to fill all positions after those set for the 1981-82 level of traffic based on SSW seniority. Under the March 4 agreement, Rock Island employees retained Rock Island seniority until hired by SSW. Art. II, ง 7. Without any SSW seniority, SSW would not hire any unemployed Rock Island employee until all willing Pine Bluff Division employees bumped in on the Kansas City Division. This implementing agreement provision capped the hiring of Rock Island employees at the numbers for permanent/prior rights positions.
While the court held above that the March 4 agreement did not circumscribe the type of seniority allocation agreement the parties could make, the court does not believe the discretion given to the parties was limitless. The parties could not make a seniority agreement that vitiated the preferential hiring provisions of the March 4 agreement. To give proper respect to all aspects of the March 4 agreement, the court cannot embrace the implementing agreement provisions that eliminate the major benefit labor won in the March 4 negotiations. Labor did not receive any protective pay guarantees from railroads or guarantees of a designated level of employment on any line in the March 4 agreement. For the monetary protective payments, labor sought redress in Congress. If no railroad purchased a line on the Rock Island or Milwaukee, BCE associated with the line had the very limited hiring rights of the Milwaukee or Rock Island Acts. 45 U.S.C. งง 907, 1004. From the March 4 agreement, labor gained preferential treatment for BCE in hiring on any line purchased.
The implementing agreement in this case eliminates the preferential hiring provisions of the March 4 agreement for the unemployed Rock Island brakemen. Defendants have submitted no evidence and point to no language in the March 4 agreement to support their claim that an implementing agreement can take away what the March 4 agreement expressly granted to BCE. A reading of the entire March 4 agreement convinces the court that the contract for future employment practices *1329 stated in the side letter and section four of the February 23 agreement violates the March 4 agreement.
The court also finds invalid the prior rights provisions pertaining to the Eldon, Missouri, Rock Island terminal. Contrary to prior understandings on who and how many would work the Missouri traffic attributable to the Tucumcari Line, both signatories to the February 23 agreement were aware that it had no relevance to future hiring for Tucumcari Line traffic in Missouri. Thus, while the implementing agreement language was identical to that found in the Cleveland proposal, the crucial difference was in how the Eldon terminal fit into future SSW employment plans. By agreeing to this provision, SSW eliminated for the Eldon terminal the base level of preferential hiring assured to other terminals by pre-February 23, 1982 hiring practice under the March 4 agreement and the February 23 agreement. SSW violated the March 4 agreement a second way by eliminating preferential hiring for Rock Island brakemen at the terminal where Tucumcari Line traffic would travel in Missouri.
SSW committed a final violation of the March 4 agreement by its transfer of furloughed Pine Bluff Division employees to Pratt in July 1982. Pursuant to the February 23 agreement provisions on hiring for non prior rights positions, SSW moved eight Pine Bluff employees to Pratt for several months work. SSW's action was in contradiction of the March 4 agreement. The positions were attributable to the Tucumcari Line; no diversion occurred before January 5, 1983. Therefore, any additional manpower needs created by the Tucumcari Line should have been filled with Rock Island brakemen. SSW erred by using Pine Bluff employees to fill those eight positions.
As noted above, because the ICC adopted the March 4 agreement as the labor protective conditions for the Rock Island employees, any contract breach by SSW is a breach of the June 1980 ICC order. Therefore, SSW's contract breaches violated the ICC order and are actionable under 49 U.S.C. ง 11347.
The February 23 agreement did not violate the rights of the yardmen pursuant to the March 4 agreement. SSW would hire yardmen for all non-diverted yard positions on the Kansas City Division. If traffic increased on the Kansas City Division, the parties would determine which line was responsible for the percentage of the increase and allocate jobs accordingly. Finally, brakemen could not bid for yard jobs until April 1984 โ the converse corollary to the brakemen provision. All of these major provisions are in accord with the March 4 agreement.

F. THE DUTY OF FAIR REPRESENTATION
UTU's actions in the 1980-83 period are scrutinized under the statutory DFR a union owes to all members of its bargaining unit โ in this case the entire plaintiff class. The Eighth Circuit recently explained the scope of the union's duty:
In order to establish unfair representation by a union, the claimants must show that the union's representation was `perfunctory, arbitrary, discriminatory or in bad faith.' International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 47 [99 S.Ct. 2121, 2125, 60 L.Ed.2d 698] (1979). A union representing a majority bargaining coalition owes a strict supplementary duty of fair representation to the position of a minority group within the coalition with interests adverse to the majority. In Steele v. Louisville & Nashville R.R., 323 U.S. 192 [65 S.Ct. 226, 89 L.Ed. 173] (1944), the Supreme Court held `that the organization chosen to represent a craft is to represent all of its members, the majority as well as the minority and is to act for and not against those whom it represents.' Id. at 202 [65 S.Ct. at 232]. Further in Vaca v. Sipes, 386 U.S. 171, 177 [87 S.Ct. 903, 909, 17 L.Ed.2d 842] (1967), the Court declared:
[T]he exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination *1330 toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.
Beardsly v. Chicago & North Western Transp. Co., 850 F.2d 1255, 1266-67 (8th Cir.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1340, 1341, 103 L.Ed.2d 810 (1989).
A court's review of a union's bargaining record must not be unduly harsh or rigid. The court must remain mindful that a union often has competing interests within its membership when it makes a contract. In particular when entering into a seniority allocation agreement, the union must have latitude in bargaining. Provisions in a contract that discriminate against a portion of the union may be legitimate. Humphrey v. Moore, 375 U.S. 335, 349-50, 84 S.Ct. 363, 371-72, 11 L.Ed.2d 370 (1964); Ford Motor Company v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953); Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 202-03, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944).
The court rules that the exclusion of Rock Island representatives from the implementing agreement negotiations in late 1981 and early 1982 violated UTU's DFR. A union must allow a minority group of its members to participate in the negotiation of the implementing agreement. Bernard v. Air Line Pilots Assoc., Int'l., AFL-CIO, 873 F.2d 213, 216-17 (9th Cir.1989); Beardsly, 850 F.2d at 1270 (implementing agreement under the March 4 agreement on former Rock Island track reached without participation of Rock Island representatives violated duty); Teamsters Local No. 42 v. N.L.R.B., 825 F.2d 608, 612-14 (1st Cir.1987); Branch 6,000 Nat'l. Assoc. of Letter Carriers v. N.L. R.B., 595 F.2d 808, 812-13 (D.C.Cir.1979).
Like the situation in Beardsly, plaintiffs were UTU members; UTU was contractually bound to have representatives from both BCE and PC employees; and the group who ultimately made the implementing agreement had interests in direct conflict with plaintiff's contractual rights. 850 F.2d at 1270. Even worse than the scenario in Beardsly, the two labor groups worked together for a long period of time before Arnett prevented the Rock Island representatives from participating in the negotiations. In Beardsly, the PC's employees were openly hostile to the Rock Island employees from the beginning of the implementing agreement negotiations. See Id. The lengthy period of joint representation in this case highlights the sudden change in UTU's conduct. UTU breached its DFR by continually misleading Rock Island representatives about when the next negotiating meeting would be held while secretly concluding an implementing agreement.
UTU's offers several explanations for Arnett's conduct; none are valid. The primary justification for Arnett's negotiation of the implementing agreement by himself was that he had the necessary authority under UTU's constitution. Under normal circumstances, this is likely a correct view. However, when representatives from two groups must participate in negotiations to allocate seniority on a purchased line, Arnett's authority as a general chairman to conclude bargains is not supreme as a matter of law.
Arnett's contemporaneous actions also undercut his and Hardin's trial testimony about who was the proper UTU bargaining agent. Unlike at trial, Arnett did not state at any time in late 1981 or early 1982 that he had the sole power to negotiate the implementing agreement. When Rock Island representatives asked about scheduling another meeting or Arnett informed them he could not schedule another meeting, Arnett did not announce he could negotiate by himself and would do so thereafter. Instead, he continued to explicitly or implicitly tell Rock Island representatives they were a part of the negotiations and would be informed when the next meeting was set up. Arnett's actions substantially belie his claim he had authority to negotiate the agreement himself.
UTU also rationalizes that Crago's presence would have prevented the conclusion of an agreement. Without an agreement, the parties would have gone to arbitration, and the Rock Island employees would have *1331 received a less favorable agreement from an arbitrator. This argument is largely illusory. First, UTU's description of Crago as an "obstructionist" is more properly viewed as a characterization. The parties view Crago differently because he represented the group that became the plaintiff class. One person's champion is another's nemesis. While he may have vigorously asserted the rights of the Rock Island employees on certain issues, the dominant reason labor and management could not reach an agreement in 1980-81 was labor's lack of a clear position. The meeting in Cleveland in July 1981 settled this problem. Defendant's assertion that Crago prevented an agreement with outlandish demands in the fall of 1981 is not supported by any evidence; no negotiations took place at that time. Pls. Response Brief at 37-39.
Second, the contention that an arbitration would not have netted plaintiffs as good a deal as they received under the February 23 agreement begs the question. Plaintiffs could not force the issue to arbitration under Art. II, ง 9(b), if they were not present at the negotiations. Plaintiffs' representatives in the negotiations could not intelligently make a choice about whether to accept a deal or push the issue(s) to arbitration without full participation in the negotiation process. Although purely speculative and not particularly germane, plaintiffs may have won several or more claims in arbitration. Arbitrators have recognized Rock Island representatives' rights to some carryover seniority, UTU Ex. 214C at 9-10, and the right to work at jobs stemming from MP trackage rights because they were attributable to the Tucumcari Line. Pls.Ex. 42 at 2-3 (Brotherhood of Railway Carmen v. UTU, Arb. no. 11905, December 10, 1986). UTU denied plaintiffs the required access to the negotiations and potentially the arbitration process; this conduct violated UTU's DFR.
The court now turns to defendants' main assertion: Even if plaintiffs were not adequately represented in the negotiation of the implementing agreement, they still received a fair and possibly an excellent seniority allocation agreement. Most succinctly, UTU argues Arnett traded any additional preferential hiring of Rock Island employees for prior rights with the existing permanent positions. As detailed in the previous sections, Arnett did several arbitrary acts in violation of the March 4 agreement to make the hypothetical trade: 1) He neither included plaintiffs in the negotiations nor asked them if they wanted to make this alleged trade; and 2) He put on the trading block the most important provision of the March 4 agreement to BCE โ the preferential hiring provisions.
In return, Arnett received largely what SSW offered in its June 1980 proposal: prior rights in the old Rock Island district where hired and an SSW seniority date of the date hired by SSW. The implementing agreement was slightly different in that it designated positions rather than people for prior rights before April 1984 at the various terminals. This change was necessary because SSW's additional manpower requirements were not as certain in May 1980 as they were in 1981-82 after the completion of substantial rehabilitation of the Tucumcari Line. With the number of trains stabilized, the parties could accurately gauge the level of employment then attributable to the Tucumcari Line. The court does not view the change from hiring people with prior rights until 1984 to hiring people for prior rights positions until 1984 as a significant matter.
Throughout this section of UTU's argument, Dkt. no. 201 at 128-140, it fails to acknowledge or appreciate the significance of several points. First, UTU seems to think that if the Rock Island brakemen had not received prior rights in the implementing agreement, they would not work any jobs on the Kansas City Division. UTU's apprehension is unfounded under a proper construction of the March 4 agreement. Second, UTU implies that prior rights designations are extraordinary arrangements. UTU labels prior rights "super seniority." After a review of other agreements and decisions by courts and arbitrators, the court found many discussions concerning prior rights arrangements. For example, all pre-1971 SSW brakemen and yardmen have prior rights in their original seniority *1332 districts and crafts on the Corsicana Line. Third, while railing against the benefits bestowed on the plaintiff class by the prior rights provisions, UTU seemingly forgets that the provisions are identical to those worked out in Cleveland when all members of the negotiating team were present. In other words, what was acceptable to the Union in 1981 (prior rights for some and additional jobs for the remaining Rock Island employees) is far too generous in the February 23, 1982 agreement when cut in half (prior rights for some but no additional jobs for the others).
UTU also asserts that the handling of additional jobs was consistent with the provisions of the Cleveland proposal. As discussed at length in the FF, pp. 49-51, Crago's deposition and letter a few days after the Cleveland meeting reveal one and potentially two methods for allocating the post-diversion jobs. Under either method, though, Rock Island employees would fill a significant number of positions on the Tucumcari Line. The court cannot accept defendant's assertion that the Cleveland proposal would provide no additional jobs for Rock Island employees.
UTU's reliance on the letter of a class representative, SSW Ex. 153 (January 20, 1982, Cohan to Arnett with cc. to Crago) to demonstrate that Arnett merely performed the bidding of Rock Island employees is unpersuasive. Cohan informed Arnett he wanted the number of permanent jobs at each terminal solidified in an implementing agreement. The court does not find the letter particularly probative that Arnett performed plaintiffs' wishes because Arnett received the letter at least a week after he concluded negotiations on the implementing agreement. Arnett received the letter on January 25 but reached tentative agreement on the implementing agreement on January 18. Second, Cohan gave no indication he was in such a hurry to reach an implementing agreement that he wished to trade the rights of all unemployed Rock Island brakemen for the protection of the already employed. All proposals known at the time of his letter adequately protected Rock Island employees already hired by SSW by prior rights or a separate seniority district arrangement, without derogating the rights of those who were not hired at that time. The letter does little to justify Arnett's conduct.
Finally, the court recognizes that when the implementing agreement granted prior rights to the permanent positions filled by Rock Island brakemen many members of the plaintiff class received a significant benefit. At a particular terminal, they are assured of a position until they die or wish to retire. These positions are also in general the best paid because plaintiffs' greater seniority at that terminal allows them to hold most of the conductors and regular brakemen positions. The court does not view these benefits as a windfall in the manner advocated by the UTU. Prior rights is not something that fell from the sky; all UTU officials agreed to the arrangement in July 1981 in Cleveland. The court is plainly aware that one side cannot usually sustain all of its negotiating positions in formulating a new agreement. The court finds untenable, though, UTU's position that it can cut its minority partner out of the negotiations, give away the partner's biggest benefit for something the opponent said it would already provide, and then claim the minority partner got a great deal.
The court finds that Arnett acted arbitrarily and in bad faith in handling the number of prior rights positions at the Eldon terminal in the implementing agreement. He failed to secure jobs for Rock Island brakemen over trackage rights SSW would almost certainly secure despite the repudiation by Huntington of a prior agreement on this point. UTU points to nothing that Arnett gained by this further concession. The court cannot countenance his conduct. In sum, the court finds UTU breached its DFR to the Rock Island employees in the way it negotiated the February 23 implementing agreement and in some of the key terms of the agreement.
Although a District Court cannot normally review an arbitration award, a breach of the DFR by a union in presenting a claim in arbitration is actionable, and the *1333 court can vacate the arbitration award. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567, 96 S.Ct. 1048, 1057-58, 47 L.Ed.2d 231 (1976); Barnett v. United Airlines Inc., 738 F.2d 358, 362 (10th Cir. 1984).
UTU also breached its DFR in the negotiations preceding and at the Warshaw arbitration. Arnett and Huntington manufactured a dispute regarding the jobs at Jefferson City and at all terminals west of Kansas City. By numerous concessions, Arnett created two questions for arbitration that each had only one answer. The obvious answer to both questions favored SSW and the Pine Bluff Division employees. SSW would first employ furloughed Pine Bluff employees and save much money; all furloughed men were from the Pine Bluff Division, Arnett's constituents. A thorough review of the various drafts of the MP implementing agreement, the arbitration submissions and decision, and the relevant trial testimony convinces the court that Arnett was not merely grossly deficient in representing Rock Island employees, but colluded with Huntington to limit the rights of Rock Island brakemen.
Hardin did appoint a representative for the Rock Island employees to appear at the arbitration. This action was too little too late. 8 Miller 28-33 (explaining Arnett's failure to inform the Eldon local chairman about the arbitration; Miller's discovery of the arbitration one week before it was to begin, and his plea for an eleventh hour appointment of a UTU vice president to represent the Rock Island employees). Arnett and Huntington had already framed the questions and no coherent argument could be made to support a claim of the Rock Island employees. Under these circumstances, the court must conclude Arnett acted arbitrarily and in bad faith.

G. REMEDIES

1. Scope of Relief
The court must first sort out who SSW damaged and then turn to what sort of relief they should receive. Under the court's construction of the March 4 agreement, the portion of the plaintiff class entitled to major relief, hiring or backpay, is relatively small. The yardmen receive no relief. All Tucumcari Line yard jobs went to Rock Island yardmen. They received all the protection afforded by the March 4 agreement. Yardmen are not entitled to hiring for brakemen positions.
Non-Tucumcari Line yardmen or brakemen are not entitled to relief under the March 4 agreement.
Tucumcari Line brakemen are the only group that will receive some sort of relief. The court will refer to the brakemen in two groups: 1) "pre-'83 hires", those hired during 1980-82 and 2) "'83 hires", those hired in the summer of 1983. One other plaintiff, Howard Howser, requires a bit of discussion. SSW made a good faith attempt to locate every possible Tucumcari Line Rock Island brakemen in July 1983, when SSW needed more employees to handle the increased traffic. Plaintiff Howser is the only plaintiff who turned down jobs with SSW in 1982 and 1983. Plaintiffs argue Howser's actions were reasonable in 1982 because he believed he could get a job in Missouri when SSW got trackage rights and reasonable in 1983 because the job offered was not pursuant to the March 4 agreement. Howser's testimony, however, does not support his contentions. 17 Howser at 19-33. The court concludes he declined the two job offers because he wished to stay in Eldon. Id. at 25-27. Howser, like many plaintiffs, was enamored with the idea of remaining at his Rock Island terminal. The testimony plaintiffs rely on was elicited by leading questions and for a limited purpose of corroborating other testimony. The court determines Howser's motivation for refusing the jobs is not as plaintiffs' claim.
The other major threshold question is whether the court should determine the remedy. SSW argues in its reply brief that the proper remedy is for the court to send the parties back to the bargaining table and if necessary to arbitration. Dkt. no. 210 at 27-33. SSW contends that their suggestion would comport with the procedures found in the March 4 agreement. SSW is correct on the procedural aspect *1334 but this is beside the point. Defendants did not properly follow the March 4 procedures or make a good faith attempt to interpret all of its provisions regarding brakemen in 1982 and 1983. The court does not perceive that justice or a sound allocation of time or money would be served by ordering all the parties back to negotiations. SSW's suggested remedy would undoubtedly create an additional delay and possibly spawn more litigation; neither likely outcome is desirable.
The court will order relief to remedy the contract and DFR breaches. Since the creation of this cause of action, the Supreme Court has consistently given district courts the power to fashion "make whole" relief for DFR breaches. Steele v. Louisville & Nashville Ry. Co., 323 U.S. 192, 206-207, 65 S.Ct. 226, 233-34, 89 L.Ed. 173 (1944) (Plaintiffs may "resort to the usual judicial remedies of injunction and award of damages when appropriate."); Vaca v. Sipes, 386 U.S. 171, 196, 87 S.Ct. 903, 920, 17 L.Ed.2d 842 (1967); International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 48-49, 99 S.Ct. 2121, 2125-26, 60 L.Ed.2d 698 (1979); Bowen v. United States Postal Service, 459 U.S. 212, 222, 103 S.Ct. 588, 595, 74 L.Ed.2d 402 (1983) ("Of paramount importance is the right of the employee, who has been injured by both the employers's and union's breach, to be made whole."). The court will exercise its power and order appropriate relief: both damages and injunctive relief. Foust, 442 U.S. at 48-49, 99 S.Ct. at 2125-26.

2. Injunctive Relief
The court determines that some limited form of injunctive relief is necessary. Plaintiffs request myriad changes in SSW's hiring practices and seniority system. Many of plaintiffs' suggestions are no longer applicable in light of the court's narrowing of the plaintiff class. The court will turn to the two key components of injunctive relief in this matter โ hiring and seniority.

a. Hiring
The pre-'83 hires largely received proper treatment under the March 4 agreement. SSW hired them in the correct order for the various location. The lone exception was the July 1982 Pratt hiring. SSW should have hired the next eight Rock Island brakemen for those eight positions. The remedy for the affected plaintiffs is for the court to order SSW to act as if it had hired them in July 1982. Thus, the plaintiffs hired in December 1982 should now be treated as if SSW hired them a few months earlier.
The '83 hires will also get "bumped up" in their date of hire; SSW should have hired them in January 1983 because not all of the increase in traffic at that time or later was due to traffic from the Corsicana Line. SSW transferred 100 Pine Bluff employees to the Kansas City Division in January and 135 to 140 positions per month for the next four months. If the number of positions attributable to diversion is less than the number of Pine Bluff employees transferred to the Kansas City Division, SSW should have hired Rock Island brakemen for the other positions.
Under either quantification of diversion the court found credible, see FF, ง F. 5, supra, the '83 hires were entitled to the first right of hire in January 1983. First, SSW admitted that a maximum of 71 positions would be affected by diversion. The actual number SSW had to pay protection on was 30 positions less. The court concludes that a reasonable, contemporaneous estimate of positions attributable to diversion by SSW would have been 60 positions. The court finds that this number takes into account SSW's admissions and prior positions as well as SSW's concern that it not be scrutinized solely by the potentially more accurate gaze of hindsight. Second, plaintiffs' estimate would yield an even lower total of jobs attributable to diversion. With approximately 15% of the traffic diverted in the Hornung study, 31 positions in January 1983 and 38 positions for the next five months should have gone to the Pine Bluff employees (15% of the monthly total employment levels in Pls.Ex. 78, a monthly breakdown of Pine Bluff and Rock Island employment *1335 levels on the Kansas City Division). Both estimates of diversion allow for the retroactive hiring of all '83 hires at the beginning of operations to St. Louis.

b. Location and Seniority
The court formulates three general principles on these issues. First, all Rock Island employees will maintain their original SSW terminal. If prior to 1983 they received prior rights at an SSW terminal, they continue to have prior rights at that terminal. If an '83 hire, their SSW terminal is where they were hired by SSW in July 1983. Second, plaintiffs do not receive carryover seniority. Each plaintiffs' current SSW seniority date, when he was hired by SSW, governs his ability to move over the entire Kansas City Division. Third, all brakemen receive prior rights at their SSW terminals. The pre-'83 hires maintain their prior rights positions; the '83 hires are awarded prior rights at their SSW terminal.
The first principle stems from the court's desire not to start a mass shuffling of SSW employees from one end of the Tucumcari Line to the other, the court's realization that it cannot remedy all old wrongs and the court's desire not to perpetrate many new injustices with its remedial order. With six or more years passed since many of the critical events happened, the court does not want to start a new round of worker location and relocation. The court believes that work place harmony could best be preserved by leaving employees at their current locations. The second principle is a restatement of the court's rejection of plaintiffs' request for full carryover seniority, and the court's conviction that plaintiffs have no contractual right to work solely out of their Rock Island terminal.
Third, while the March 4 agreement did not require any type of seniority for BCE, the court determines that a grant of prior rights to all Rock Island brakemen is appropriate. Both SSW's June 1980 proposal and the Cleveland proposal gave Rock Island brakemen prior rights where hired. Even when the two defendants worked together to limit the hiring of Rock Island brakemen in the February 23 agreement, they gave prior rights to Rock Island brakemen. Defendants cannot claim surprise or alarm at this remedial measure in light of their past conduct. The court also deems the prior rights ruling compensation for not rearranging plaintiffs to conform to proper hiring in 1982-83. The court finds it too destructive to implement one measure of relief but can balance the remedy out with another sort of relief.
Moreover, the third principle is a necessary corollary to the first two. Plaintiffs do not have the right to work at the terminal of their choosing, but they should have received preferential hiring and from the nature of the negotiations in 1980-82 โ some measure of job security like prior rights. The ruling also comports with the dilemma faced by the pre-'83 hires who have a different SSW terminal than their Rock Island terminal: they can have a secure job away from "home" or they can work at "home" with less job security. The court does not view this as a perpetuation of some sort of cruelty but rather as a necessary part of the employment contracts in this case.
The final seniority issue is what place the '83 hires should take on the seniority rosters at their SSW terminals. The court rules that they should occupy the spots immediately after the other Rock Island brakemen with prior rights. This ruling promotes uniformity and is in accord with the March 4 agreement. The '83 hires should have been hired for all increased traffic attributable to the Tucumcari Line. The entire increase in traffic in early 1983 was not attributable to diversion from the Corsicana Line; a significant amount of the traffic was new business or a recapture of old Rock Island business. The court's resolution of the diversion issue shows that there were many more jobs created by an increase in business than Tucumcari Line brakemen to fill them. An argument could be made that the next 10-20 positions after the pre-'83 hires at each terminal should go to Pine Bluff employees to represent the level of diverted traffic followed by the '83 hires. The court has no evidence to determine the number of positions at each terminal directly caused by diversion, however. *1336 In view of the latitude given courts in awarding equitable relief and the axiom that a court need not apply judicial minutiae or specific exactitude as to each plaintiff in a class action, the court holds the most equitable, expeditious and judicially feasible solution is to give the '83 hires prior rights immediately after the other Tucumcari Line brakemen.

3. Damages

a. Pre-'83 Hires
The Rock Island brakemen hired during 1980-82 filled SSW's additional manpower needs on the Tucumcari Line. They received the preferential hiring rights provided in the March 4 agreement. The pre-'83 hires received the required wages for the periods employed by SSW.
The only actionable hiring practice by SSW was its transfer of eight Pine Bluff employees to Pratt in July 1982. SSW should have hired Rock Island brakemen for those positions. Thus, the first eight Rock Island brakemen hired after July 1982, most likely in late 1982, should have received those positions. As damages for this illegal hiring, the eight should receive the wages the eight Pine Bluff men received and protective pay for the intervening period until they were actually hired.
All plaintiff brakemen make a claim for the pool caboose allowance ("PCA"). The March 4 agreement provided that "(a)n employee of the Rock Island or Milwaukee hired by a purchasing carrier shall come under the coverage of all contracts, schedules and agreements in effect between such carrier and its employees concerning rates of pay, rules, working conditions and fringe benefits,...." Art. II, ง 8(b). The PCA gives each roadman with prior rights or who was hired between October 18, 1971 and July 26, 1974, a little more than a penny per mile per trip. Pls.Ex. 11E at addendum 16, ง 5 & addendum 33 at ง 6. The court holds that the PCA is a rate of pay or a fringe benefit. The pre-'83 hires are entitled to the PCA for their entire period of employment with SSW.

b. '83 Hires
The '83 hires have several claims for damages. First, they should receive several months extra wages. As described above, SSW should have hired from this group in December 1982 or January 1983 instead of July 1983. This group will then get an average wage for the period between their new date of hire and the date actually hired in the summer of 1983. Second, the '83 hires are also entitled to back pay for the difference between the salaries they should have received as prior rights employees and the salaries they did receive until the day of this order. They are entitled to this amount because they were not allowed to make the proper election between a prior rights job at their SSW terminal or working off the extra board at their Rock Island terminal (Herington or Eldon/Jefferson City). In 1983 to 1989, the '83 hires had only two mediocre choices: work off the bottom of the roster at their SSW terminal or at their Rock Island terminal. SSW erroneously gave them this choice and cannot complain that it must compensate them for whatever election the '83 hires made. Third, the '83 hires should receive vacation pay and sick leave based on their Rock Island seniority date in accordance with the March 4 agreement for all time from their new date of hire until the date of this opinion. Fourth, as prior rights employees, they are entitled to the Pool Caboose Allowance for all trips taken with SSW over the last six years.
At this time, the court is not persuaded that a special master is needed to calculate the damages specified in the preceding sections. The court is certain that the parties can work out these relatively simple matters and report to the court the amount of damages. After the damages calculations are complete and approved by the court, plaintiffs' counsel shall submit an application for attorney fees.

H. APPORTIONMENT OF DAMAGES AMONG DEFENDANTS
The question of which defendant(s) in a hybrid contract/DFR suit should pay plaintiffs' damages has reached the Supreme *1337 Court in three recent cases. Bowen v. United States Postal Service, 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983); International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). These cases involved distinct breaches by each defendant. For example, an employer terminated an employee without justification, and the union failed to contest the termination in grievance or arbitration proceedings. In this case, however, defendants' breaches are not separate or distinct but contemporaneous and joint. On this fact pattern, courts have decided that joint and several liability is appropriate. Bowen, 459 U.S. at 223 n. 11, 103 S.Ct. at 595 n. 11 (dicta); id., 459 U.S. at 230, 242, 103 S.Ct. at 599, 605 (White, J., dissenting); Vaca, 386 U.S. at 197 n. 18, 87 S.Ct. at 920 n. 18 (dicta); Baskin v. Hawley, 807 F.2d 1120, 1132-33 (2d Cir.1986) ("(W)hen a union has caused or participated in the underlying wrong of the employer, it is appropriate to hold it jointly and severally liable for the employee's loss."); Jones v. Transworld Airlines, Inc., 495 F.2d 790, 798 (2d Cir.1974) (merits).
This court agrees with the Second Circuit and holds that the Supreme Court's dicta pronouncement of joint and several liability when defendants take joint action against plaintiffs is applicable to this case. Defendants in this case did act in concert to damage plaintiffs. They worked together to thwart the negotiation process in late 1981 and early 1982. They hid the negotiations from the Rock Island representatives. Both defendants prospered from the February 23 implementing agreement. Later, both again worked together to orchestrate the Warshaw arbitration to further limit the hiring of Rock Island brakemen. UTU did attempt to mend its ways in the Spring of 1983 after its Board of Appeals chastised the negotiations preceding and terms of the February 23 agreement. UTU's conduct was far too late; the cow was out of the barn. SSW knew that with the composition of UTU's membership UTU could not strike. SSW had no incentive to bargain away the favorable terms of the implementing agreement or the Warshaw arbitration. The court does not view UTU's 1983 conduct as vitiating its numerous previous breaches. The court holds both defendant's jointly and severally liable on the hybrid action.
On the statutory cause of action, 49 U.S.C. ง 11347, SSW is solely liable for all the breaches of the March 4 agreement.
If plaintiffs cannot recover its entire judgment from SSW, it may recover from SSW's parent company, SPT.
IT IS BY THE COURT THEREFORE ORDERED that plaintiffs are awarded relief consistent with this opinion. IT IS FURTHER ORDERED that the parties submit a damages calculation in 60 days. IT IS FURTHER ORDERED that plaintiffs submit a fees and costs petition 30 days after the damages report; defendants shall have 30 days to respond; plaintiffs shall have 10 days to reply.
*1338